THE PIERCE MILL COMPANY, PLAINTIFF IN ERROR,
v. J. F. KOLTERMANN ET AL., DEFENDANTS IN
ERROR.

[FILED JUNE 13, 1889.]

1. **Mills and Mill-dams.**  Where a mill-dam is built across a
natural water course without leave to build or continue the
same obtained under the provisions of the statute, one or more
owners of lands overflowed or injured thereby, may prosecute
proceedings, under the provisions of the statute, against the
owner of such mill-dam for the damages caused by such over-
flow or injury; and neither in the pleadings nor upon the trial
will the persons so proceeding be required to negative the ex-
istence of other property also overflowed or injured by reason
of the erection of such dam, nor of other persons entitled to
damages therefor; nor will the person so proceeding be re-
quired to prove or establish any fact which would be necessary
or favorable to the owner of such mill-dam in a proceeding by
him for leave to build or continue the same.

2. ————.  An allegation of pleading that land was damaged by being
"overflowed," *held*, established by proof that the water of the
stream being set back by the dam and caused to stand at a
greater depth in the bed of the stream, by reason thereof per-
colated through the earth so as to rise and stand therein within
one and two feet of the surface.

ERROR to the district court for Pierce county.  Tried
below before CRAWFORD, J.

*Edward P. Holmes,* for plaintiff in error, cited: *Wil-
loughby v. Shipman,* 28 Mo. 50; *O'Brien v. City of St.
Paul,* 18 Minn. 176; *Solms v. Lias,* 16 Abb. Prac. (N. Y.)
311; *Williams v. Morland,* 4 D. & R. 583.

*H. C. Brome,* for defendant in error, cited: *Parker v.
Boston & Maine R. R.,* 3 Cush. (Mass.) 107; *People v. Mur-
ray,* 5 Hill, 468.

Cobb, J.

This action was tried in the district court of Pierce county, and was brought to this court on the petition of the Pierce Mill Company, the plaintiff in error.

Koltermann and Griebnow, the plaintiffs below, allege that they are the owners of certain described tracts of land in township 26 in said county; that the north fork of the Elkhorn river is a natural water course running through and across their lands; that in the year 1883, the defendant, a corporation duly organized under the laws of this state, erected a dam about nine feet high across said water course, and built a water grist mill one mile below their lands; that in November 1884, the defendant raised its dam to twelve feet, and in November, 1885, again raised it to fourteen feet, and maintained it at that height, by which their lands were overflowed and flooded to their damage respectively of $2,500 and of $2,000.

They further allege that the defendant has not paid nor in any manner compensated them for such damages; nor have any proceedings been had or instituted by defendant, or other persons, for the purpose of ascertaining such damages or determining the right of the defendant to erect and maintain said dam, or for a writ of *ad quod damnum* in the premises; with prayer for such writ and relief.

The defendant, by its amended answer, denied all the allegations of the petition.

2. That it erected and maintained its dam across the Norfolk river on its lands at a height not to exceed twelve feet.

3. By reason of which the plaintiff's lands have not been overflowed or damaged in any sum whatever, but have been greatly benefited and increased in value.

The writ having been issued to the sheriff of said county as prayed for, and an inquest having been held as provided for by law, damages were assessed to the plaintiff Koltermann, of $900, and to Griebnow of $750, to which assess-

ment and return the defendant filed its objections and motion to quash, which were overruled.

There was a trial to a jury with findings for the plaintiffs and verdict of $642.35 for Koltermann and $481.76 for Griebnow, on which judgment was entered.

When the owner of a mill already erected, or when a person desiring to erect a mill, for the purpose of establishing a right or privilege to occupy or overflow the lands of another person or persons, goes into court for that purpose, the statute points out the course which he is to pursue, which is quite the same in principle as that necessary to be pursued by railroad companies in acquiring rights-of-way for tracks over the lands of others, and, as in such cases, the provisions of the statute must be substantially followed. The object of the statute is to provide an effective, expeditious, and inexpensive, method of ascertaining whether the erection of the mill, with its necessary dams, etc., at the point indicated, in view of its public utility, its probable effect on the neighborhood, its effect on the free passage of fish in the stream, and other considerations of a *quasi* public character, privilege to erect such mill should be granted, and, if so, what amount of damage will be sustained by the several inhabitants and property-holders to be affected thereby. This proceeding would of course be equally effective, as well as more expeditious and less expensive, by embracing all parties affected in one action. The plaintiff, a mill owner, is equally interested in having his privilege established against all persons and property interested, or which may be the subject of damage by reason of the improvement. Hence the law imposes the duty upon him to give them all notice, makes the assessment of damages general, as well as to each individual property holder, and gives to all a standing in court, from which to show, if they can, that the mill is not a work of public utility; that its erection would be injurious to the public health of the neighborhood, or would

prevent the free passage of fish in the streams; and many courts have held that the record must show affirmatively that all such persons have been duly notified, so as to take part in the proceedings, or a judgment establishing the plaintiff's privilege to erect and maintain the mill, would not be upheld.

Section 14 of our Mill-Dam Act (Chap. 57, Comp. Stats.) provides that:

"Where any person may have built a mill or other dam, whereby the water of any river, creek, run, or spring, may be rendered stagnant, or any lands may be overflowed or injured thereby, any person, or any number of persons, interested therein, or who may be damaged by the stagnation or overflowing of said water, or otherwise, may file a petition against the owner of such mill-dam, for such writ, and like proceedings shall be had *mutatis mutandis*, as where the owner of a mill-dam so built brings the petition. But such owner shall have ten days' previous notice of the filing of the petition."

Section second of said act provides in reference to the proceeding of the person desiring to erect a dam that he shall set forth in his petition as near as may be, among other things, and shall describe with certainty, the lands above and below such dam, the property of others which are or will probably be overflowed or injured as aforesaid, and shall give the name of the owner of each tract, or, if the name of any such owner be unknown, the plaintiff shall so state in his petition.

It seems to me there need be no trouble nor difficulty in understanding not only that the statute itself which requires the petition in the one case to set out the names of all land-owners above and below the dam in the second section, does not apply to proceedings under the fourteenth section, but that the reason of such rule, which is plain and obvious when applied to one, is entirely wanting when applied to the other. Neither the letter nor the spirit of the

law requires that a proceeding under the fourteenth section should be necessarily commenced by all of the persons whose property may be injured by the erection of the dam, while that of the second section, where the proceedings are commenced by the mill owner, clearly requires that he should bring in all persons interested, and that his record should negative the existence of any others.

The plaintiffs in the case at bar confine their complaint and suit to the ascertaining and recovery from the mill owners of the damages sustained by them severally in their property by reason of the setting back of the water over and upon their land by reason of the said dam. They did not seek to litigate the propriety of the location of the dam at that point as a work of public utility. They did not desire to investigate the effect that the dam would have upon the public health. They did not even desire to enter upon a discussion of, nor claim any interest in, the important question of the free passage of fish in the waters of the stream. They instituted the action for the sole purpose of settling and recovering their damages as stated. Can it be doubted that they had a right to present this question alone? Nor were they under obligation, either imposed by the law or in common reason, to assume the duty of hunting up and investigating the property and rights of other parties of even a like character, much less that their right to proceed at all could depend upon bringing in all such claimants, or that the validity of their record depends upon, or would be made to depend upon, their having presented and litigated and the court having passed upon every other question which could have been raised in a proceeding by the mill company to establish and settle their privilege.

Having examined twenty-one of the cases cited by counsel for the plaintiff in error, I find each of them, with possibly one exception, and that not clearly so, to be cases where the proceedings were commenced for the purpose of establishing the privilege of the miller to erect and main-

tain a dam; and I find nothing in either in conflict with the views expressed.

Under the third head, counsel present the point that the language of the petition is that plaintiff's damage was caused by "the overflow of water," hence that the court erred in the admission of evidence that the plaintiff's property was injured by the result of the percolation of water through the same. Although it is not pointed out in the brief, the evidence to which I presume counsel refers is the following, from the testimony of plaintiff Koltermann:

Q. When that dam is maintained at the height of fourteen feet, you may state what is the width and size of that stream of water at the point where it runs through your land.

A. I once measured it from four or five different places. It measured from sixty to one hundred feet wide.

Q. What was its depth?

A. Where my land begins, on the south side, it was fully ten feet deep; on the upper side it was six — on the west side.

Q. What effect, if any, does that condition of affairs have upon your facilities for crossing the stream?

A. I have to go around the public road to the county bridge and go across there; go across to Griebnow's for about twelve rods, and go on the line.

Q. What distance is it, more?

A. From my house it is about fifty rods to the bridge.

Q. Well, the distance clear around?

A. Clear around, it would make it about ninety rods, I would say — clear around to my barns and stables.

Q. Where was your house?

A. On one side of the stream.

Q. And your barns and stables?

A. They were on the same side of the stream, but the other side of the road.

Q. What was the character of your land adjoining to this stream?

A. It was level bottom land.

Q. What effect, if any, had the maintenance of this dam at the height of fourteen feet, and kept so full of water, upon the balance, or any portion of the tract, other than that actually occupied by the stream?

A. The land on the west side of the creek is all low and very level. This body of water was high on the farming ground. I could get water within two feet of the top of some of it.

Defendant's motion to strike the last answer from the record, for the reason that it is an attempt to prove a condition of affairs not charged in the plaintiff's petition, was overruled by the court, and exception taken.

The witness continued: And on some of my hay land the water was as close as one foot of the top of the land.

Q. What effect does that condition of affairs have on the use of the land?

A. I had forty-five acres of hay land there; at least thirty acres of it turned into smart grass, and sword grass; no cattle will eat it at all.

Q. Was any portion of the land affected in this way cultivated land, plowed land?

A. Yes, the water was within two feet of the top.

Q. How many acres of your land was affected in that way?

A. There are 130 acres on the west side of the creek; that is all low and level.

The word "overflow," when applied to the surface of land, doubtless is correctly defined in Webster: "To fill beyond the brim or margin; to deluge; to submerge; to drown;" but its sense as used in the plaintiff's petition is not necessarily confined to the surface of the land, but to the ground itself, which, according to Blackstone, reaches to the center of the earth.

It is fairly deducible from the testimony quoted that the plaintiff's land within one and two feet of the surface was

:as free from water as agricultural lands ordinarily are, but
·by means of the dam the water was so set back in the
stream as to under-flow the ground within one and two feet
·of the surface. The foundation of the evidence to this ef-
fect was, I think, sufficiently laid in the petition in the
·words *overflowed and greatly injured.*

There seems to have been a long and exhaustive trial in
the court below, conducted with discretion, and without
·complaint that the damages found for either plaintiff are
·excessive.

The judgment of the district court is therefore affirmed.

JUDGMENT AFFIRMED.

THE other Judges concur.