JOSEPH C. MEISTER ET AL., APPELLEES, V. FRED C. KROTTER, APPELLANT.

FILED MAY 12, 1936. No. 29540.

*Cordeal, Colfer & Russell* and *C. M. Bosley,* for appellant.

*Edmund D. Shipley, contra.*

Heard before GOOD, EBERLY and PAINE, JJ., and CLEMENTS and THOMSEN, District Judges.

THOMSEN, District Judge.

The plaintiffs claim damages resulting to their land from overflow claimed to be caused by defendant's erection of a dam in the Frenchman river. Defendant appeals from a verdict and judgment for plaintiffs.

The land involved is located about one-half mile from the town of Palisade, Nebraska. During the irrigation season the water from the river is diverted to the Culbertson irrigation canal. This canal or ditch has existed for 40 years. It lies north of the river in distances from the intake varying up to one-half mile. Following the meanderings of the river channel from its diversion point, it traverses about two miles when it again nears the ditch. At this latter point the ditch is about ten feet above the present water level of the river. It is near here where the defendant's river dam was erected. The ditch has a fall of approximately one and a half feet in one mile. The fall in the river's course to the dam is approximately four feet from a point about one mile above. The land of the plaintiffs lies immediately north of this latter point. The river passes through plaintiffs' land; the ditch bounds the land on the north. A waste-gate and spillway from the ditch, about one-fourth mile above the point mentioned, admits water on occasion through a former stream-bed to the Frenchman river. This waste-gate is about 32 feet wide. From November to about May all the water from the ditch is wasted through this source, flowing down the river through plaintiffs' land, through defendant's land, and eventually over defendant's dam. The dam is a substantial concrete structure. Its height by measurement of one witness is slightly over five feet; by the estimate of others as much as eight feet. Its

length is approximately 37 feet. Its foundation is either rock or clay with an apron of concrete extending 20 feet into the river. It raises the river level to the height of the dam. On the opening of the waste-gate the ditch may spill water to a height, it is claimed, of the water-head in the ditch, about three feet, thus further raising the river level.

Plaintiffs claim that, by the erection of the dam, backwater overflows part of their land, especially in the winter season, rendering the same waterlogged and increasingly unfit for agricultural and hog-raising purposes; that the flow of the stream is impeded, permitting its freezing in winter, thus unfitting it for watering uses. The defendant contends that the dam raises the water level to no greater height than normal; that 1,700 yards of gravel were removed in 1924 from the river bed in both plaintiffs' and defendant's land, and that by such removal and subsequent erosion during the next four years the river bed was lowered four to six feet; that the water level in the river now is no higher than its normal level in 1924. The dam was erected in 1930.

The defendant asserts, as a matter of law, his right, under his theory of the evidence, to restore the original water level, and though citing no cases to sustain this assumption, the application of the proposition is not challenged in the brief of plaintiffs. See *Johnk v. Union P. R. Co.*, 99 Neb. 763, 157 N. W. 918, and converse of the proposition in *Mitchell Drainage District v. Farmers Irrigation District*, 127 Neb. 484, 256 N. W. 15. Assuming, then, under the conditions, the absolute right of defendant to erect a dam so to raise the water level, the question of fact for solution is whether the water level was raised beyond what was the normal flow before the claimed erosion. The latter covers a period between 1924 and 1928.

The evidence is definitely in conflict. On plaintiffs' behalf some removal of gravel is admitted, but the claimed effect of lowering the water level and the subsequent claimed four to six foot erosion of the river bed is denied.

One witness, a ditch rider, who began work in 1926, testified that the river's water level was never lowered; and others described conditions from all times subsequent to 1920. Direct evidence of what constituted the height of normal flow is lacking. The defendant alone testifies to the claimed *erosion*. We find definitely no corroboration of this testimony. Alluvial deposits of sand and gravel from the ditch were a constant occurrence and cast doubt on the claimed erosion. Others on defendant's behalf give evidence to the height and flow of water and the position of nails on a bridge over a feed-stream from which the river's height at times may be inferred. From our interpretation of the testimony, this bridge is located on the section line at the Bobtail creek, a distance one-half mile south of the southernmost portion of plaintiffs' land. The elevation point was fixed as of 1915, the time the bridge was built. These witnesses do not testify to any continuous condition nor as to the rainfall at various times. The jury viewed the territory. Of course, the credibility of all such witnesses and the weight of the testimony were for the jury.

Formidable evidence of scientific measurements of various present heights was submitted. By these it is shown that the water level of the river at a point on the southernmost side of plaintiffs' land is 3.91 feet above the top of the dam, in the stream at the waste-gate 4.5 feet; and the land levels are at the first point mentioned 6.4 feet above the top of the dam and 4.5 feet at the second point. Other points are also selected showing height of both river and land above top level of the dam, from which should follow an inference of impossibility that the damming of the water could have had any effect on plaintiffs' land. At the time these measurements were taken two-tenths of a foot of water was passing over the dam. At that time plaintiffs assert the ditch carried 3.2 feet head of water. Upon release of this flood the spread of water would depend upon the volume at the point of release and the rapidity of its escape. Necessarily the height of the im-

pounded water in the river would be raised to some extent beyond the dam top. Elevations of the surface of the river through plaintiffs' land are also substantially higher than the top of the dam. This must be taken into consideration in estimating the effect of the release of the ditch water into a channel already filled with retarded water to a height of at least five feet at the dam site. No flooding of plaintiffs' land had occurred during the forty years between the building of the irrigation ditch and the erection of the dam. This seems strongly persuasive that seepage from the ditch or from a higher dam built by plaintiffs was not the cause. The time the latter was erected is not shown in the record.

Test holes were dug in various parts of the land in which the water rose to heights beyond the level of the dam top. The water in the river upstream was also higher. It is claimed that the river was retarded and its volume increased by the dam; that the river was so affected through plaintiffs' land. Of course, the whole stream would to some extent be affected and the water-table would be raised; so it does not follow that, because the test holes showed an elevation of water greater than the top of the dam, the damming of the water was not the cause of the water in the test holes. In some measurements the test holes showed water higher than the adjacent stream. Without a showing of the directly adjacent soil, this would not prove conclusively that the water in the test holes did not come from the stream; its source may have been a higher point in the stream, a soil through which the water could more easily percolate. Again, if the water-table were raised by elevating the stream, the plaintiffs would be entitled, under their pleadings, to recover for loss thus suffered. *Pierce Mill Co. v. Koltermann,* 26 Neb. 722, 42 N. W. 877. An upper riparian owner is not required to bear any burden which a lower proprietor creates by the erection of a dam. *Flader v. Central Realty & Investment Co.,* 114 Neb. 161, 266 N. W. 965. Moreover, if the jury found the elevation of the river had not been

changed by the removal of the gravel,—and this might easily be found, for the record shows many gravel and sand bars in the river and does not show from where the gravel was removed or that the claimed changed condition was continuous to the time of the erection of the dam,—then it would follow that the defendant had unlawfully changed the river's level five feet, and all the measurements become mere speculation as to what the conditions would be if the dam had not been built.

All the foregoing covers the defendant's first three assignments of error relating to the sufficiency of the evidence and its effect on instruction No. 8 given by the court.

Objection is made to the admission in evidence of the loss of hogs by drowning. By substituting the word "hogs" for "cattle" in the following, we find a satisfactory answer to this objection:

"The plaintiff, in testifying as to how the construction of the dam affected his land by raising the water above the natural flow, stated that it increased the danger of stock drowning therein, and that he had already lost some cattle in that manner. This was objected to, and on the ruling error is sought to be predicated. The statement was only made as an illustration of the damage occasioned by the rise of water in the stream because of the construction of the dam. The rule for measuring the damage sustained was correctly given the jury in the instructions of the court, which was stated to be the difference in the fair market value of the land immediately before and after the erection of the mill-dam. The jury could not have been misled by the testimony objected to, and none of the rights of the defendant were prejudiced thereby." *Jerabek v. Kennedy,* 61 Neb. 349, 85 N. W. 279.

The fourth and last assignment of error relates to the court's giving an instruction on the measure of damages. Although plaintiffs' counsel contends that the case was tried on the theory of temporary damages, and defendant's counsel is uncertain whether the pleadings and evidence

submitted the theory of permanent or temporary damages, the court instructed on permanent loss. The dam is built of concrete. It is a large and substantial structure. How large and substantial must such construction be before it may be classed as permanent? The test seems to us to be whether the barrier may readily be removed. No evidence on the subject appears in the record. In view of this lack of evidence and the description in the record, we assume the dam is a permanent one from which continuous effects may be expected. So what loss the plaintiffs may have suffered is permanent and the damages, though not immediately perceptible, would be suffered the moment the water was impounded. In the state of the evidence, the proper measure of their recovery is the difference between the value of the land affected before and after the dam was erected, taking into consideration the uses to which the land was put and for which it was reasonably suitable. *McClure v. City of Broken Bow*, 81 Neb. 384, 115 N. W. 1081. To determine any such loss, the present condition of the soil proximately caused by the damming of the water and all effects up to the present time would be relevant to determine its value. Those matters are shown in the evidence. What is not shown with reasonable arithmetical certainty, which in such cases is required, is the estimate of the land's value after the dam was built. The value before the erection is fixed at $200 an acre. The lesser value cannot be left entirely to speculation. Such value is generally fixed by experts, the major weight of whose testimony is their foundation. To know upon what facts and experiences a witness bases his opinion of value is the chief source of accuracy in judging the weight of his testimony and the reliability of his estimate. The foundation of jurors for judging value is not known nor shown in the record; and to permit jurors to rely on a mere view to reach a conclusion of value would lose the constraint of reasonable accuracy. Enough of speculation remains by permitting the jurors to fix the damages by considering both their view of the

premises and the testimony. *Town of Hingham v. United States,* 161 Fed. 295; *Republican Valley R. Co. v. Arnold,* 13 Neb. 485, 14 N. W. 478, criticizing *Fremont, E. & M. V. R. Co. v. Whalen,* 11 Neb. 585, 10 N. W. 491; *Fremont, E. & M. V. R. Co. v. Marley,* 25 Neb. 138, 40 N. W. 948.

If the structure is regarded as permanent, the evidence is insufficient to sustain the verdict because the value of the land after construction of the dam is not shown; if it is regarded as a temporary obstruction, the measure of recovery for permanent loss submitted in this instruction is incorrect. In view of the foregoing, the judgment is reversed and the cause remanded.

REVERSED.