JOSEPH C. MEISTER ET AL., APPELLEES, V. DEAN KROTTER
ET AL., APPELLANTS.
278 N. W. 483

FILED MARCH 18, 1938. No. 30241.

C. M. Bosley and Cordeal, Colfer & Russell, for appellants.

Edmund D. Shipley, contra.

Heard before GOSS, C. J., ROSE, DAY, PAINE and MESSMORE, JJ.

MESSMORE, J.

This is an appeal from the district court for Hayes county wherein a jury returned a verdict in the sum of $4,000 in favor of the plaintiffs for damages resulting to their land from an overflow alleged to have been caused by the erection of a dam by defendants. The court required a remittitur of $1,000 which was filed. The defendants have appealed.

The pleadings of the parties admit the ownership of the land in question in the respective parties, and the erection of the dam by the defendants. Plaintiffs' petition alleges, in substance, damages to the land caused by the erection of the dam in question by defendants, causing overflow on

plaintiffs'.land, and set forth the elements of ·damage contended for, which will be covered later in the opinion. Defendants' amended answer contains a general denial, and alleges that the plaintiffs acquiesced in the building of the dam, and that the channel of the Frenchman river had not been raised above its former elevation; that sand and gravel had been removed from the river bed where it flows through plaintiffs' land, which deepened the channel of the river and lowered the natural level of water in said stream, so that the lands, which had been formerly subirrigated and for that reason productive, became barren and unproductive; that the dam was erected with authority of law, and the effect was to raise the water level in the Frenchman river substantially to its former height and to benefit the lands adjacent to the stream. The reply is, in effect, a general denial to the amended answer.

The evidence discloses that plaintiff Joseph C. Meister has lived in Hayes county since 1886 and has owned the land in question since 1915, the land being located about one-half mile north of the town of Palisade, Nebraska, described as the northwest quarter of section 31, township 5 north, range 33 west of the 6th P. M.; that highway 25, running from Palisade to highway 17, extends along the east side of this quarter-section on the half-section line; that the house is located 20 rods west of the road; that there are barns, sheds and other improvements near the house; that plaintiffs are engaged in the business of stock-raising and farming; that the land directly east, being the northeast quarter of section 31, is also owned by the plaintiffs.

The Frenchman river enters the land of plaintiffs in the northwest corner of the northwest quarter of said section 31, and adjacent thereto is the Culbertson irrigation ditch, which follows the Frenchman river. The river and irrigation ditch run across the north side of the two quarter-sections in question. The ditch is 40 feet in width, and its purpose is to divert the water from the Frenchman river at the northwest corner of the northwest quarter. It has

been in use for a period of more than 40 years, without change in location, dimensions or elevations. It continues across the north part of the northwest quarter in an easterly direction, and when it reaches the east side of the northwest quarter near highway 25 it runs northeast for a short distance and touches the north line of the quarter, then turns back in a southeasterly direction 60 to 70 rods, then runs almost straight south to the head-gate, which is located about 80 rods east of highway 25 and near the center of the northeast quarter of section 31. The ditch carries the entire flow of the Frenchman river from where it enters the plaintiffs' land and diverts the waters from the Frenchman river down to the head-gate. The ditch turns the corner and around the bend and runs nearly straight east and a little southeast and continues down the Frenchman river valley from the head-gate. The old Frenchman river channel runs from the northwest corner of the northwest quarter of section 31 along side of the ditch for 30 rods or more. The ditch turns slightly to the east, and the old river bed runs a little southeast until it meets the outlet of the ditch and crosses highway 25 about 70 rods south of the place where the ditch crosses said highway. The old river channel extends from this point a little southeast for about 60 to 65 rods, then turns in a southerly course, and runs almost straight south nearly to the county road. The road is across the south side of plaintiffs' land. There is a channel connecting the point where the river turns almost south to the county road and the head-gate in the ditch. This channel comes from the head-gate and empties into the old bed of the Frenchman river, which is the old Stinking Water channel. Stinking Water creek enters the northwest quarter of section 31 for a short distance west of highway 25, north from said quarter-section. The Frenchman river bed extends from where it leaves the plaintiffs' land on the south side thereof down to where it approaches the ditch a half-mile or so east of their land, runs a little southeast for about 20 rods, then turns east and south again into a bend on the Krotter

land, then turns back east right close to the side of the ditch. This point is about a half-mile from where the Frenchman river bed comes back right close beside the ditch east of the southeast corner of plaintiffs' land. Inclosed in the southwest corner of the northeast quarter of section 31, bounded on the east and north by the old Frenchman river bed, is a 20 to 25-acre tract of land formerly used for pasture, now used for a hog pasture, bedding and feed lot. There is a fence along the north side of the hog pasture, running east to where the river turns south.

From the time that plaintiffs acquired the land until the fall of 1930, the old river channel as it ran through the hog pasture was a narrow, low stream, 8 to 18 inches deep, 3 to 6 feet wide, which never froze up in the winter and was used for watering stock. Along this stream grew various kinds of shrubbery and trees, cotton, willow, and plum thickets. East of the hog pasture is an alfalfa patch consisting of 30 to 35 acres, in the southeast corner, bounded on the west by the river and the hog pasture, on the north by the Culbertson ditch, on the east and south by the half-section line. These two portions of land are the tracts involved in this action. The foregoing constitutes plaintiff Joseph C. Meister's description, which is fairly accurate with the exception of proximate distances that may vary some from other descriptions and the maps in evidence. The dam is located on the northeast corner of the south half of section 32. This dam is of concrete structure and extends from bank to bank of the Frenchman river, has concrete wing walls which extend upstream and downstream from the dam to converge the stream to a width of approximately 37 feet, has a concrete floor about one foot thick and extends downstream 20 feet or more. The footings are sunk in hard clay or bed rock. The dam rises to a crest of 5 feet 1 inch above the surface of the bed rock. The flow of the Frenchman river between the waste-gate and the dam passes over the barrier through all the year.

There are different estimates given in the testimony as

to the exact height of this dam. The wings on the dam are from 8 to 10 feet back of the dam. There are flash boards on the top of the dam on the north side. The concrete is about a foot higher on the south side of the dam than on the north side. There is an opening, 3 by 9 feet, right at the bottom of the dam. There are maps in evidence, one in the brief of appellants, one exhibit 3 made by Fred Krotter, and maps made by the engineers, some of which have to do with the topography, the elevations of the land at different points, and water-tables, which will be discussed hereinafter.

The testimony of the plaintiffs was to the effect that the damage started after the erection of the dam in 1930, when the water raised and spread over the bottom, which resulted in freezing up the small stream of water, shutting it off for live stock purposes, and compelling plaintiffs to cut holes in the ice to obtain water for live stock. Complaint was made to Mr. Krotter and his son Chauncey, who informed them that the ice would melt when the weather warmed up, and in the spring, when the ice did melt, the water spread over the bottom until it became muck and mire and continued so until late in the spring, or until water was taken out of the river and converted into the ditch, which is usually in April, thus leaving the hog pasture and feed lots unfit for use. The testimony further disclosed that some of the trees and shrubbery along the banks of the stream died, and that the land which had been planted to alfalfa grew crops to a height of only 6 to 8 inches. The evidence disclosed certain alkali substances in the soil of all of the land in that vicinity, belonging both to plaintiffs and defendants, and the value of the land in question immediately before and immediately after the construction of the dam.

Appellants contend that the petition of the plaintiffs is insufficient to warrant the court in presenting to the jury the measure of damages as presented, for the reason that no allegation in the petition states properly the measure of damages, and that said petition is confined, if at

all, just to damages that might result to the plaintiffs by virtue of hog-raising, and that no damages are claimed or properly pleaded for loss of crops, or as to the productivity of the land. An examination of the petition shows that it is sufficient to raise the question of damage, if any, to the land and the productivity thereof, as well as to the trees along the bank of the stream, and to the business of raising and feeding hogs. The evidence further discloses the different crops that have been raised on the land in question, the difficulty in getting a lister into the soil to list corn, and in bedding the hogs and using the land as a feeding ground, details of which it is not necessary to further state.

Appellants suggest that the reason for the lack of crops may be due to various causes, one of which is a dam erected by the plaintiffs on their land sufficient to span the Frenchman river, this dam being located in the northwest quarter of section 31, constructed in 1926, rebuilt in 1932, and washed out by a flood in 1935. It was used to impound water to enable plaintiffs to obtain ice. The dam was not permanent and not high, being about 3 feet in height. It is suggested that the flood of 1935 may have caused the condition that existed on plaintiffs' land. We scarcely believe that this position is correct, in view of the evidence.

The evidence discloses that a certain amount of gravel was taken from the bed of the Frenchman river on plaintiffs' land; that this did deepen the channel of the river, and that the reason for the construction of the dam by defendant Fred Krotter was to restore the water in the channel to its former level, to stop erosion and to benefit the lands generally. The evidence on erosion does not sustain the claim of erosion. Alluvial deposits of sand and gravel from the ditch were a constant occurrence and cast doubt on the claimed erosion.

Appellants suggest that the condition of the soil on plaintiffs' land, shown by their experts to contain alkali substances, was analogous to the condition of the soil on

defendants' land whereon crops had been raised during the same period of time in which plaintiffs claim they had raised no crops. Appellants contend that the water level in the river now is no higher than its normal level in 1924. The dam was erected in 1930, and appellants assert, as a matter of law, the right, under their theory of the evidence, to restore the original water level. Assuming, then, under the conditions, the absolute right of the defendants to erect the dam so as to raise the water level, which apparently is not challenged by plaintiffs, the question of fact for solution is whether the water level was raised beyond what was the normal flow before the claimed erosion, the latter covering a period between 1924 and 1928.

We now consider appellants' first assignment of error: That the verdict is contrary to the evidence, not sustained thereby and contrary to law, and that the plaintiffs are obligated to prove, by a preponderance of the evidence, that the obstruction of which they complain caused the damages sustained, citing *Harris v. Lincoln & N. W. R. Co.,* 91 Neb. 755, 137 N. W. 865, and other cases. On the burden of proof, there can be no doubt of the law. We believe the evidence in this case is in conflict. For years prior to the time of the construction of defendants' dam, there had been no damage to the land, the alfalfa field or hog pasture. The small stream did not freeze up and was valuable for the purpose of watering live stock. The trees were alive along the bank of the stream, and the testimony of Jasper Ray, a ditch rider from 1926 until he left after the construction of defendants' dam, substantiates the foregoing facts. He told of the difficulty that he had at the head-gate in controlling the water, and of his request to Fred Krotter in that regard; also of his difficulty in controlling the water at the head-gate after the erection of defendants' dam, compared with conditions before its erection. The natural slope and drainage in this area are from the northwest to the southeast. Jasper Ray testified that the water level in the sluice-way rose steadily until the water "got deeper on the floor of the head-gate * * * perfectly level."

This testimony would indicate an increase in the elevation. After the erection of the dam, according to Ray's testimony, the water was deep, making it hard to get to the head-gate. To overcome this difficulty he would request defendants to pull the flash boards from their dam, and, on compliance by them, he would adjust the head-gate. After the erection of the dam, the witness stated, he was unable to drain the ditch through the head-gate, and later they had to dam up the ditch to keep the water out. This trouble did not exist before the construction of the dam. On defendants' land was an open ditch, 50 to 60 rods in length, south of the ditch and northwest of the dam. When the flash boards were in the dam and the fishway was closed, water stood in the ditch, and when the dam was opened in July the ditch dried up and remained that way until the middle of September, and upon the closing of the dam water then appeared in the ditch, and by January of 1937 the water was backed up about half way in this ditch. The witness also testified that the river's water level was never lowered.

The appellants contend that the trial court erred in submitting the case to the jury, for the reason that the verdict is opposed to the undisputed physical facts and is in contradiction of physical laws,—citing *Dodds v. Omaha & C. B. Street R. Co.*, 104 Neb. 692, 178 N. W. 258; *Elwood v. Schlank*, 126 Neb. 213, 252 N. W. 828; and *Kalman v. Pieper*, 158 Wis. 487, 149 N. W. 203. The first case cited dealt with a carrier and passenger; the second was an action for personal injuries; and the third case dealt with master and servant; but these cases were cited by appellants for the principle of law announced.

Formidable expert testimony is offered, and it would unnecessarily lengthen this opinion to detail all of it; but, for the benefit of appellants' contention, we recite a part thereof briefly as follows: The dam as constructed does not cause water to overflow any portion of the northeast quarter of section 31, considering the ground levels of the land which vary from 6.25 feet at its lowest point to 10.82

feet at its highest point, in the alfalfa field, above the crest of the dam. The ground level of the hog pasture varies from 6.62 feet at its lowest to 11.08 feet at its highest point above the crest of the dam. On December 9, 1936, when all of the water of the Frenchman river was being wasted into the natural channel, the surface of the water in the stream as it flowed across the northeast quarter of section 31 varied from an elevation of 5.02 feet where the river crossed the south line of that quarter to an elevation of 6.95 feet at a point about 300 feet south of the head-gate above the crest of defendants' dam. On the same date the ground water on the northern part of the alfalfa field varied from an elevation of 6.58 feet, as measured in a test hole about 500 feet south of the head-gate, to an elevation of 4.13 feet, as measured in a test hole close to the southern bank of the Culbertson ditch, where it crosses the east line of the northeast quarter of section 31 above the crest of defendants' dam; and on the same date the elevation of the surface water as it flowed into the Frenchman river was lower than the ground water in the test holes directly west and higher than the ground water in the test hole directly east of the point in the river where it was measured. The elevation of the water in the test hole in the hog lot and pasture ranged from 5.35 feet, as shown by a point on exhibit 13, to 6.89 feet, while in the alfalfa field it ranged from 6.9 feet to 6.58 feet above defendants' dam, as .86 of a foot of water was flowing from the dam on that day. The ground waters in the hog lot and pasture varied from 4.49 feet to 6.03 feet, and in the alfalfa field 2.04 feet to 5.72 feet above the surface of the water in the river, as it flowed from defendants' dam. The above testimony was for the purpose of demonstrating that it was the water that flowed in the river, and not the defendants' dam, which affected the ground water, borne out from the fact that the elevation of the water flowing from the dam was lowered by the removal of the flash boards from .95 of a foot on March 22, 1937, to .21 of a foot on March 23, 1937; that the surface of the water

in the Frenchman river, where it flowed through plaintiffs'
land, was actually higher than on the latter date. A
general summary of the foregoing evidence in behalf of the
defendants was to the effect that the elevation of the
ground water in the hog lot was controlled by water that
came from the west; that the elevation of the ground water
in the alfalfa field was controlled by water in the Culbert-
son ditch and the Frenchman river, and that the elevations
could not have been influenced by the dam. Other wit-
nesses for defendants gave evidence as to the height and
flow of waters and the nails on a bridge across Bobtail
creek, from which the height at times may be inferred.
This bridge is located on the section line at Bobtail creek,
a distance of one-half mile south of the southernmost por-
tion of plaintiffs' land. The elevation point was fixed as of
1915 when the bridge was built. No witnesses testified
as to any continuous condition on the rainfall at various
times.

While the testimony of the experts is impressive and
instructive, still it presented facts to be submitted to the
jury, and is entitled to the weight the jury might see fit
to give it. Plaintiffs have shown the condition which
existed before and after the construction of the dam. True,
this is lay testimony, but testimony which is entitled to
such consideration as the jury might see fit to give to it.

Taking into consideration the test holes dug in various
parts of the land in which the water raised to heights
above the level of the dam top, the water in the river up-
stream was also higher. Therefore, it is claimed, the river
was retarded and its volume increased by the dam, and
the river was so affected through plaintiffs' land. Of
course, the whole stream to some extent would be affected;
the water-table would be raised; so it does not follow that,
because the test holes showed an elevation of water greater
than the top of the dam, the damming of the water was
not the cause of the water in the test holes. Some of the
measurements showed water higher than the adjacent
stream. The evidence is not conclusive that the water in

the test holes did not come from the stream. Its source may have been a higher point in the stream, the soil through which the water could more easily percolate. *Meister v. Krotter*, 131 Neb. 35, 267 N. W. 161.

Again, there are certain water-tables analyzed in the evidence, and from the figures the water levels in the various test holes increased from November to December, and increased still further from December to March. The question arises as to whether or not the dam impounded these waters and to some extent backed them up beneath the plaintiffs' land. We must remember that the dam raised the elevation of the water at the point where it was constructed and that, where such elevation is now 5 feet 1 inch, it was formerly 18 inches. Certain water levels were taken which will not be repeated in this opinion, but which were for the purpose of showing beyond question that defendants' dam did not affect the ground water levels under the plaintiffs' land in the northeast quarter of section 31. The general slope of the alfalfa area is from northwest to southeast, and the water, surface and subsurface, turns in that direction. All of the evidence must be taken into consideration, and we do not believe that defendants' evidence is of such a conclusive nature that it would bar the right of plaintiffs to have the question submitted to the jury. If the water-tables were raised by elevating the stream, plaintiffs would be entitled, under their pleadings, to recover. *Pierce Mill Co. v. Koltermann*, 26 Neb. 722, 42 N. W. 877. An upper riparian owner is not required to bear any burden which a lower proprietor creates by erection of a dam. *Flader v. Central Realty & Investment Co.*, 114 Neb. 161, 266 N. W. 965.

We have set out hereinbefore the construction of defendants' dam and believe such construction is permanent, and that plaintiffs were entitled to have submitted to the jury the permanent damages. Some objection is made on the part of appellants that plaintiffs must be bound by the damages that accrued immediately after the construction of the dam, and not for the period

of years for which they claim damages, namely, 1932, 1933, etc. Several cases are cited in this regard under proposition 4 of appellants' brief.

In *Meister v. Krotter, supra,* the proper measure of damages is stated in syllabus No. 1 as follows: "In assessing recovery for permanent damages to land, the evidence must show with reasonable arithmetical certainty the values before and after the event which gives rise to the action."

Apparently, the above case was reversed because the evidence did not show with reasonable arithmetical certainty the values before and after the event which gave rise to the action. This record discloses the value of plaintiffs' land before and after the erection of the dam, and an examination of the record discloses that the elements of damage were taken into consideration. We believe that the plaintiffs had, without doubt, a right to testify as to the value of their land before and after the erection of the dam. It is well established that the owner of property may testify as to its value. The other witnesses, farmers and landowners in the vicinity, gave their opinions, based on proper questions, as to the respective values of plaintiffs' land, which was a matter for the jury's determination. We see no error in the admission of this testimony.

Certain exceptions were taken to the remarks of the trial judge through the course of the trial. After a careful examination of the record, we are convinced that the court made no statements that affected the substantial rights of the defendants, or such as would constitute reversible error.

Exceptions have been taken to instructions given by the trial court, but under our analysis of the evidence and the measure of damages in this case, the instructions, considered as a whole, properly state the law, and we believe there is no prejudicial error therein, and no prejudice resulted to the substantial rights of the defendants by the giving of such instructions. Other assignments of error are without merit.

The cross-appeal of the plaintiffs is dismissed. The trial judge properly required a remittitur to be filed in the sum of $1,000 when he believed, from all the evidence, that the damages awarded by the jury were excessive. We are of the opinion that a further remittitur in the sum of $600, reducing the judgment to $2,400, would meet the requirements of this case under the evidence.

The order, therefore, will be that, if within 20 days from the releasing of this opinion, plaintiffs will file a further remittitur of $600, the judgment so reduced will be affirmed for $2,400; otherwise, the judgment will stand reversed and a new trial ordered.

AFFIRMED ON CONDITION.