Lincoln C. Applegate, Appellee, v. Platte Valley Public Power and Irrigation District, Appellant.

285 N. W. 585

Filed May 12, 1939. No. 30516.

*Beeler, Crosby & Baskins* and *Robert B. Crosby*, for appellant.

*Wells C. Jones, contra.*

Heard before Simmons, C. J., Rose, Eberly, Paine, Carter, Messmore and Johnsen, JJ.

Simmons, C. J.

This is a suit for damage to plaintiff's land and leasehold, caused by seepage from the intake canal and reservoir of the defendant. Judgment was for the plaintiff. Defendant appeals.

The plaintiff owns and is in possession of 312 acres of land along the South Platte river in Lincoln county. He also is the tenant of land adjacent to his fee title land. This land has a good top soil over sand and gravel, is subirrigated by the natural waters that flow under the land, and in its natural state produced abundant crops.

The defendant is a district organized under the provisions of Senate File No. 310, Laws 1933, ch. 86, now (as amended) sections 70-701 to 70-717, Comp. St. Supp. 1937. The function of the defendant is generally that of the storage and sale of water to irrigation districts and the development and sale of electrical power.

Defendant's reservoir covers an area of about 2,500 acres, and is so constructed that it will hold at full capacity 175,000 acre-feet of water. In the construction of the reservoir, it was necessary to use large quantities of earth in building two dams. Top soil was removed to a depth of twelve feet in many places from about ninety acres inside the reservoir. There was exposed thereby an underlying strata of very sandy porous soil. The lands of the plaintiff lie between the defendant's reservoir and the river. The bottom of the reservoir is about sixty feet above the level of plaintiff's land. The defendant started to store water in its reservoir in December, 1935, and at one time had in storage approximately 70,000 acre-feet of water.

Within approximately sixty days after the defendant started to store water in its reservoir, seepage appeared on plaintiff's lands. In 1936 the defendant agreed with the plaintiff to construct and maintain a drainage ditch to remove the seep water and maintain the normal water level. A drainage ditch was constructed that year.

In 1937 there was a major break in defendant's canal. The flood water overflowed large areas of plaintiff's lands, further saturating them. When this flood water receded, the drainage ditch was found to be washed deeper than it had been constructed, and, as a result, certain areas of plaintiff's subirrigated land became dry, and plaintiff was compelled to irrigate those portions by pump irrigation.

The seepage continued on other parts of plaintiff's land. Defendant attempted to relieve the seeped condition of the land of the plaintiff and others by an extension of its drainage system. This had some effect, but as a result of the seepage in 1936 and 1937 a large area of plaintiff's lands became water-logged, alkali deposits were left upon the

surface soil, alfalfa and valuable native grasses were killed, and annual crops were destroyed or damaged.

Plaintiff sued, alleging these facts. The first cause of action was for damages to his lands owned in fee and for loss of crops thereon. The second cause of action was for damages for loss of the value of the alfalfa during the years 1936 and 1937 on the leasehold.

Defendant's answer admits its corporate capacity, the construction and maintenance of the storage reservoir for use in supplementing water of the Platte river for irrigation purposes and development of electrical energy, and generally denied the other allegations of plaintiff's petition.

Plaintiff's witnesses testified as to the facts herein recited. Plaintiff's witnesses, over objection of the defendant, by reference to a chart setting out by areas the seeped, alkalied and other damaged parts of plaintiff's lands, testified as to the value of the land in 1935, and the value of the land at the time of the trial in 1938, based upon its then condition and productivity. The computed depreciation in value of the lands fixed by one witness was $7,051; by another witness, at from $5,339 to $6,657.50; and by a third, at from $4,158 to $5,807.50.

Defendant's witnesses did not testify as to the amount of the damages. They frequently admitted that the damage to plaintiff's lands was due to seepage from the reservoir. They testified that, *if* and as damage from seepage occurred, it was their purpose to drain the lands; that they had partially constructed a drainage system; *and* that *if* their contemplated drainage system was completed, and *if* it was maintained, and *if* it operated as they contemplated it should operate, they would be able to abate the seepage and the damage resulting therefrom.

Defendant admitted that it was speculative as to what effect this drainage system would have on the plaintiff's lands. Its witnesses stated that there was no way of knowing positively that it would relieve the damage from seepage; that the partially completed system had been effective in relieving excess waters, and that the completed system

would "operate to improve," "materially drain," and "lower perceptibly" the seeped condition; that they could not say it would be 100 per cent. perfect, nor how many years it would take to effect that improvement; that it was too much to expect that the drainage system would restore all lands to their previous condition; that "if the drainage ditch was maintained, *and assuming relative amount of seepage is the same*," it would be beneficial; and that maintenance work on the drains at least once a year or oftener would be necessary.

The evidence shows that alkali deposits are in the sub-soils in that area; that the seep water brings the alkali to the top soil; that, upon evaporation, the alkali is left in the top soil; also, that, if the water level is lowered permanently, additional alkali deposits will not accrue, and by the normal processes of rainfall, clean water coming onto the top soils would carry the alkali back into the lower soils and eventually remove it so far as its damaging qualities are concerned.

Evidence was admitted both as to the value of the use of the land and the depreciation in value of the land itself.

In rebuttal, plaintiff's expert witness testified that the drainage system, as constructed, and as contemplated, will not entirely relieve the seeped condition of plaintiff's lands. This witness agreed with the defendant's witnesses that as time goes on there will be a material deposit of soils in the bottom of the reservoir, and a considerable sealing will take place by that process, with the result that there will be a stoppage in the quantity of the leakage *from that source*. He further testified that the action of the water on the shallower portions of the reservoir will take therefrom the top soils and continuously expose graveled portions of the soil, where leakage will occur constantly; that this situation can never be cured; and that seepage will continue so long as water is maintained in the reservoir.

The reservoir never has been filled to capacity. At the time of the trial, it contained a small amount of water. Plaintiff's rebuttal witness testified that, when the reser-

voir is filled to capacity, there will be an additional quantity of water for seepage; that the leakage has a drop of forty feet to the mile; that the water will be under pressure, which will increase the leakage and increase, and not decrease, the seeped conditions of plaintiff's lands.

The jury viewed the premises. The jury awarded the plaintiff $6,500 on his first cause of action, and $600 on his second cause of action. Defendant does not complain about the latter award.

Defendant on appeal admits that plaintiff has suffered damage as a result of seepage from its reservoir. It contends that it constructed the reservoir with knowledge that seepage would occur; that, upon the first appearance of seepage, it had proceeded with plans for, and the construction and operation of, a system of drainage canals to relieve that condition and reclaim the lands; that damage must first accrue before it can be abated and eliminated; that such damage is incidental to the public improvement; that the seepage presents a temporary problem and is not a permanent injury to the lands; that the plaintiff has adequate protection under the rule of temporary damages, and is entitled to recover *recurrently* each year for damages which he suffers *until the land is reclaimed by drainage,* and that plaintiff should not be entitled to recovery for "permanent damage and also a damage for loss of crop on some of the same lands, which constitute a double damage, and then, under the condition of the record in this case, be allowed to bring further suits for loss of future crops or be allowed to benefit from the use of his lands returned to full production by drainage and reclamation."

Therefore, the defense is based upon the proposition that a landowner, under these circumstances, must be content to sue each year for the damage that has occurred as the result of the seepage during that year, based upon a loss of use, and that he has no other present remedy. In the court below the defendant did not offer to pay temporary damages. By its answer, defendant denied those damages.

The cause of the damage to plaintiff's land is the per-

manent construction and proposed permanent operation of the reservoir. Defendant does not propose to abate that cause. Defendant proposes to abate the result of the storage of the water (the seepage), and this proposal depends upon (1) a willingness and ability of the defendant in the future to build and maintain a drainage system; (2) the proper maintenance of that system; (3) the assumption that the drainage system contemplated, if constructed and maintained, will relieve the damage. Defendant's contentions, therefore, are in the nature of an affirmative defense to an admitted cause of action. The question of this defense being within the issues made by the pleadings is not presented, and not decided.

On the first and second propositions, there is no showing of any action taken by the defendant's board of directors, or other responsible officials, declaring an intention, or making it a binding obligation of the defendant, to construct and properly maintain a drainage system. The "defendant is financed solely by public money in the nature of federal loans and federal grants." There is no showing that the defendant is financially able to or can secure funds with which to build and maintain an adequate drainage system.

On the third proposition, as is pointed out herein, there is a dispute as to whether or not the drainage system, if constructed, will effectively relieve the damage to plaintiff's lands.

No new act of the defendant is required to produce the continuance of the injury except the use of its reservoir for the purpose for which it was constructed. New and continuing acts of the defendant and the expenditure of indefinite amounts of money for an indefinite time in the future, depending upon the contingencies hereinbefore discussed, are necessary to abate that injury, if it can be abated.

A temporary injury is defined in 32 C. J. 521, as "An injury that may be abated or discontinued *at any time,* either by the act of the wrong-doer, or by the injured party." (Italics ours.)

"A permanent injury to real property, as distinguished from a temporary or continuing injury, is one of such a character and existing under such circumstances, that *it will be presumed to continue indefinitely.*" (Italics ours.) *Worden v. Bielenberg,* 119 Minn. 330, 138 N. W. 314.

The cause of the damage to plaintiff's land is permanent. *Meister v. Krotter,* 131 Neb. 35, 267 N. W. 161. The question raised by the evidence is the question of the extent of the possible abatement of those damages in the future.

Could the plaintiff sell his land for its full value under the rule advanced by the defendant? Would a purchaser pay full value, knowing that he must continually litigate the right to receive annual returns from his property? Would a purchaser pay full value for this land even conceding the completion and present effective operation of the drainage system, knowing that, if the defendant failed to continue its operation, or if the system in the future failed to work, his land would be damaged in value, either temporarily or permanently, and that he would have controversy and possible litigation with the defendant to recover therefor? Obviously not, and, if not, it follows clearly that there has been permanent damage to plaintiff's land, for which, on defendant's theory, the law would either deny him compensation, or would delay the granting thereof.

The Constitution of this state provides: "All courts shall be open, and every person, for any injury done him *in his lands,* goods, person, or reputation, shall have a remedy by due course of law, and justice administered *without denial or delay.*" Const. art. I, sec. 13. "The property of no person shall be taken *or damaged* for public use without just compensation therefor." (Italics ours.) Const. art. I, sec. 21. See *Gledhill v. State,* 123 Neb. 726, 243 N. W. 909.

Section 70-707, Comp. St. Supp. 1937, provides: "Any district organized under the provisions of this act shall be liable for all breaks, overflow and seepage damage. *Damages*

*from seepage* shall be recoverable when and if it accrues."
(Italics ours.)

Defendant concedes that it is "liable for damages accruing from breakage, overflow and seepage, regardless of whether any negligence is chargeable or proved in connection with the construction of its works," but contends that "the only fair interpretation of the statute is that it contemplates temporary recurrent instances of seepage damage and provides a recovery for such damage by the landowner affected."

The legislature did not so limit the defendant's liability. One illustration is sufficient to answer that contention. Suppose in this case that the defendant made no effort to abate the damage to plaintiff's lands. Could it be argued that the legislature intended that the plaintiff would be limited to a recovery from year to year for a loss of use of his lands, and that he never could recover for permanent damage although that permanent damage had accrued? The legislature stated that damages from seepage shall be recoverable when and if it accrues. The language is clear. It places no limitation upon either the right of, or the remedy for, recovery.

Section 70-707, Comp. St. Supp. 1937, grants to defendant certain powers of eminent domain and refers, in the sentence immediately preceding the one under discussion, to section 46-617, Comp. St. 1929. That section provides (among other things) that the owner of a storage reservoir "shall be liable for *all* damages arising from leakage or overflow of the water therefrom." (Italics ours.)

Defendant cites no provision of the statute which would compel it to maintain an adequate drainage system. The legislature evidently contemplated the payment for, and not the abatement of, damage from seepage.

"As a general rule, if a nuisance is permanent in character, is intended to remain in the condition in which it was erected until destroyed by the elements, and the damages are to the land itself, especially where the erection is for a public or semi-public purpose, the damage is treated as

original, to be recovered in one action, and not continuous in character." *Irvine v. City of Oelwein,* 170 Ia. 653, 150 N. W. 674.

The measure of damages for the injury to the land is the difference in value before and after the dam was erected, taking into consideration the uses to which the land was put and for which it was reasonably suitable. To determine any such loss, the present condition of the soil proximately caused by the damming of the water and all effects up to the present time would be relevant to determine its value. *Meister v. Krotter, supra;* 3 Kinney, Irrigation and Water Rights (2d ed.) sec. 1697; *Gledhill v. State, supra.*

Defendant complains that the jury were instructed on the theory of permanent damage to the land and also instructed that they could allow temporary damage for loss of use.

An instruction allowing plaintiff to recover for the loss of crops in 1936 and 1937 and for the depreciation in the value of his land as of the time of trial in 1938 was proper. *Fremont E. & M. V. R. Co. v. Harlin,* 50 Neb. 698, 70 N. W. 263.

It is obvious by their verdict that the jury correctly understood the instructions, that they considered the damages to plaintiff's lands to be permanent, and that they accepted the plaintiff's evidence as to the permanent depreciation in value.

Defendant offered no evidence as to the value of the property if the damage was partially abated, so the jury were furnished no basis upon which they could calculate an abatement of the damage on defendant's theory.

We do not recommend these instructions as models of exact statement to be followed hereafter. However, "under our analysis of the evidence and the measure of damages in this case, the instructions, considered as a whole, properly state the law, and we believe there is no prejudicial error therein, and no prejudice resulted to the substantial rights of the defendants by the giving of such instructions." *Meister v. Krotter,* 134 Neb. 293, 304, 278 N. W. 483.

We do not decide the question of the sufficiency of this defense as a matter of law. It is sufficient for the decision here that the question of whether the proposed drainage would be effective, and to what extent, was a disputed question of fact which the jury resolved against the defendant.

Defendant's contention that the affirmance of this judgment will permit the plaintiff to sue again for either crop losses or further claimed permanent damage to his lands is not a matter presented by this record, and is one which can and will be met should that contingency occur.

AFFIRMED.