Sam Luchsinger, appellee, v. Loup River Public Power District, appellant.

299 N. W. 549

Filed July 25, 1941.   No. 31105.

*C. N. McElfresh* and *August Wagner*, for appellant.

*Walter, Flory & Schmid, contra.*

Heard before Rose, Eberly and Paine, JJ., and Eldred and Ellis, District Judges.

Rose, J.

This is an action by Sam Luchsinger, plaintiff, to recover from the Loup River Public Power District, defendant, damages for destroying by drainage subirrigation of lands owned by him.

Plaintiff alleges in his petition that he owns in Platte county 68 acres of land in the north half of the northeast quarter of section 16, and 80 acres consisting of the east half of the northeast quarter of section 17, township 17 north, range 1 east of the sixth P. M., and that defendant excavated adjacent to or near these lands below the underground water-table a permanent tailrace extending from its power plant near Columbus to the Loup River and thus destroyed by drainage the formerly existing subirrigation essential to the production of crops on his lands, to his damages in the sum of $6,035.

Defendant resisted plaintiff's claim for damages on the grounds that it owns in fee the lands in its right of way for its tailrace and as such owner had a right, under the common law adopted by Nebraska, to intercept percolating waters under other lands without liability for resulting damages; that the value of plaintiff's lands was not depreciated by defendant; that defendant did not lower the water-table under plaintiff's lands; that the water-table was lowered by drought and other causes before the tailrace was excavated; that plaintiff was not deprived of subirrigation or damaged by excavation and maintenance of the tailrace.

Upon a trial of the cause the jury rendered a verdict in favor of plaintiff for $4,500. From judgment therefor defendant appealed.

The petition and the evidence were challenged by motion for a peremptory instruction in favor of defendant after both parties had rested, and the overruling thereof is assigned as error. In the argument on this ruling defendant stated its position as follows:

"The defendant further contends that the common law is in force in this state as to subsurface percolating waters and that it had a lawful right to dig on its own land without liability for resulting drainage of subsurface waters from the adjacent lands"—citing in support of the common law cases from other jurisdictions.

The common law of England invoked by defendant was

first adopted by statute in 1866. In its present form it is as follows:

"So much of the common law of England as is applicable and not inconsistent with the Constitution of the United States, with the organic law of this state, or with any law passed or to be passed by the legislature of this state, is adopted and declared to be law within the state of Nebraska." Comp. St. 1929, sec. 49-101.

By a divided court the common law applicable to seepage was stated as follows in 1930:

"In this state the owner of an irrigation canal or ditches is not liable to one whose land is injured by seepage from said canal or ditches, not intentionally caused by him, unless he is negligent in the construction or operation of the works. Therefore, the owner of an irrigation canal or ditch is not an insurer against seepage therefrom, but is liable only for negligence and intentional wrong-doing." *Spurrier v. Mitchell Irrigation District,* 119 Neb. 401, 229 N. W. 273.

In the case at bar, the damages of which plaintiff complains were not caused by negligence or malice. The common-law rule applicable to seepage was rejected in 1933 in so far as seeped lands within public power and irrigation districts organized under the 1933 act were concerned. The statute provides:

"Any district organized under the provisions of this act shall be liable for all breaks, overflow and seepage damage. Damages from seepage shall be recoverable when and if it accrues." (1933 p. 349.) Comp. St. Supp. 1939, sec. 70-707.

While this enactment does not say that drainage of sub-irrigation waters creates a liability for resulting damages, it departs from the common law and is in harmony with a constitutional provision which is superior to, and at variance with, the common law. The Bill of Rights declares:

"The property of no person shall be taken or damaged for public use without just compensation therefor." Const. art. I, sec. 21.

The Constitution of Nebraska does not make negligence or malice a condition of recovering from a public power dis-

trict damages for destroying by drainage subirrigation essential to the production of crops on lands of a private owner. Subirrigation in the natural condition of land used for farming is a valuable property right attached to the land itself. *Osterman v. Central Nebraska Public Power and Irrigation District,* 131 Neb. 356, 268 N. W. 334, following *Olson v. City of Wahoo,* 124 Neb. 802, 248 N. W. 304. A rule of law in conflict with the common law of England has been adopted in Nebraska in the following language:

"The American rule is that the owner of land is entitled to appropriate subterranean waters found under his land, but he cannot extract and appropriate them in excess of a reasonable and beneficial use upon the land which he owns, especially if such use is injurious to others who have substantial rights to the waters, and if the natural underground supply is insufficient for all owners, each is entitled to a reasonable proportion of the whole, and while a lesser number of states have adopted this rule, it is, in our opinion, supported by the better reasoning." *Olson v. City of Wahoo,* 124 Neb. 802, 248 N. W. 304.

It is argued, however, that this is dictum in the opinion in which it appears and not binding on defendant in the present controversy. Whatever may be thought of its applicability to the case in which the rule was adopted, it answers for itself as a sound proposition of law essential to the protection of property rights of private individuals and is consistent with the Constitution and with morality and justice. It expresses the wisdom of the Roman Senate to the effect that private property cannot be taken for public purposes except on an estimate of its value; of the Magna Charta which declares that no one shall be deprived of his property except by the law of the land and by the judgment of his peers; of the Code of Napoleon which provides that no one can be compelled to give up his property except for the public good and for a just and previous indemnity; of the people of the United States who inserted in their Constitution the fundamental principle that private property shall not be taken for public use without just compensation; of

the Nebraska Bill of Rights declaring that "The property of no person shall be taken or damaged for public use without just compensation therefor."

The American rule is not only law in Nebraska, but it applies to property damaged for public use as well as to property taken for public use. In an early case the supreme court said: "The words, 'or damaged,' in sec. 21, art. I, of the Constitution, include all damages arising from the exercise of the right of eminent domain which cause a diminution in the value of private property." *City of Omaha v. Kramer*, 25 Neb. 489, 41 N. W. 295.

Later it was held: "Whatever reduces the market value of real estate by the injuring of it for public use may be considered in determining the just compensation to which the property owner is entitled." *Lowell v. Buffalo County*, 119 Neb. 776, 230 N. W. 842. See, also, *Chicago, R. I. & P. R. Co. v. O'Neill*, 58 Neb. 239, 78 N. W. 521; *James Poultry Co. v. City of Nebraska City*, 135 Neb. 787, 284 N. W. 273.

The demurrer to the petition was properly overruled.

Is the evidence sufficient to sustain a verdict in favor of plaintiff on the controverted issue that defendant, by drainage, destroyed subirrigation under the lands described in the petition and thus reduced the value thereof? Is the verdict excessive? The water that passes through defendant's powerhouse near Columbus empties into the Loup River by means of the tailrace, or artificial canal, which was excavated by defendant from the outlet to the powerhouse, a distance of three miles or more. One bank of the open canal adjoins the east 68-acre tract of plaintiff in section 16, but is some distance from the 80-acre tract in section 17. This land is in a valley and is nearly level, except for slight elevations of perhaps an acre or two above the general surface of the ground. The testimony of witnesses called to the witness-stand by plaintiff tends to prove the following facts:

The soil on plaintiff's lands is fertile, sandy loam. The water-table thereunder was generally from two to five feet below the surface and produced subirrigation before the tail-

race was excavated and from 13 to 20 feet afterwards. The normal fluctuation of the water-table under the 68-acre tract varied generally a foot or two on account of drought or other normal factors. Before defendant drained water from these lands into the tailrace, all of the soil but an acre or two was within the reach of subirrigation, but thereafter the water-table was beyond the reach of it. The lowering of the water-table lessens the productivity of the land even in wet seasons, owing, in such an event, to more rapid evaporation of rain water in the soil and quicker passage of it through sand and gravel to the water-table. While excavation was in progress water ran out of the bank adjacent to plaintiff's land and started a stream in the bottom of the ditch. The tailrace at one place when completed was 256 feet wide between the banks, 19 feet from the surface to water from the powerhouse, and about 45 feet deep. Before the tailrace was excavated, plaintiff's 68-acre tract produced good crops in normal seasons and partial crops in years of extreme drought. During the drought of 1934, before drainage, this tract, with subirrigation, produced about 30 or 35 bushels of corn to the acre. After completion of the tailrace the next year the corn crop on the same land, without subirrigation, was a failure. Crops in subsequent years were lost or seriously affected by drainage. The loss of subirrigation by drainage is permanent. The record contains evidence of the facts thus summarized. At the trial, the evidential facts presented a case for the jury on the issue of subirrigation.

A witness for plaintiff testified that the market value of the 68-acre tract in section 16 was $140 an acre before defendant excavated its tailrace and $60 an acre thereafter; that the value of the north half of the 80-acre tract in section 17 was $120 an acre before drainage and $40 an acre less afterward. The testimony of seven other witnesses for plaintiff varied somewhat from the foregoing estimates but evidenced damages in excess of the amount found by the jury. The witnesses for plaintiff generally gave the data or measurements or personal knowledge or observations

on which they based their testimony. Evidence on the existence and destruction of subirrigation includes testimony and opinion of an expert on ground-water hydrology. While evidence adduced by plaintiff is at variance with testimony of defendant's witnesses in many material respects, the record does not disclose any uncontradicted physical facts to disprove plaintiff's case or anything else to make the testimony of plaintiff's witnesses unworthy of belief.

A review of the entire record leads to the conclusion that the evidence is sufficient to sustain the verdict and that the damages allowed are not excessive in the sense that they show passion or prejudice of the jury requiring a reversal of the judgment.

The trial court permitted eight witnesses for plaintiff to testify on the issue of values and defendant complains that it was erroneously limited to four witnesses on the same issue. There seems to be no complaint of a preliminary ruling limiting each side to eight witnesses on values, but defendant contends it was entitled to a new trial because it was limited to four witnesses on the controversy over the value of plaintiff's lands before and after excavation of the tailrace. The record indicates that little attention was paid to this question during the trial, but that it was the subject of a spirited contest by affidavits at the hearing of the motion for a new trial. The record shows that the trial judge examined with deliberate care his rulings limiting the number of witnesses for defendant and expressed the conviction that he did not thereby affect the result of the trial or prejudice defendant in view of all the proceedings and evidence. What actually occurred at the trial is a material inquiry. It is shown without dispute that plaintiff produced eight witnesses, each of whom testified to the market value of the lands before and after construction of the tailrace. After he rested, defendant called a witness who testified in substance that the fair and reasonable market value of plaintiff's lands was $125 an acre before the tailrace was constructed and the same afterwards. Three other witnesses for defendant testified that the values were the same

after as before, giving figures. In addition defendant called four or more other witnesses whose testimony tended to prove that the water-table, except in depressions, was too far below the soil for subirrigation before the tailrace was excavated or was previously lowered by drought and other causes not attributable to the tailrace or that defendant did not by drainage deprive plaintiff of subirrigation for crops. The plain import of such testimony, if true, was that defendant did not, by construction and maintenance of the tailrace, depreciate the market value of plaintiff's lands. The jury necessarily so understood, but evidently disbelieved testimony of this nature, though the additional witnesses were not asked the difference in the value of the lands before and after construction of the tailrace. In these views of the record, error prejudicial to defendant does not affirmatively appear in the proceedings and judgment of the district court.

AFFIRMED.