CARL E. FAUGHT, APPELLEE, V. DAWSON COUNTY IRRIGATION COMPANY, APPELLANT.

19 N. W. 2d 358

FILED JUNE 29, 1945. No. 31937.

*Beeler, Crosby & Baskins,* for appellant.

*Frank M. Johnson,* for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, CHAPPELL, and WENKE, JJ.

SIMMONS, C. J.

In this action plaintiff seeks to recover damages for loss of crops as a result of flooding. Trial to a jury was waived and had to the court. The trial court found for the plain-

tiff. Defendant appeals. We affirm the judgment of the trial court.

We state the evidence in conformity with the rule that in a law action findings of fact made by the court have the same force and effect as the verdict of a jury, and if there is competent evidence to support them, such findings will not be disturbed on appeal. *Linch v. Thorpe,* 140 Neb. 478, 300 N. W. 383.

Plaintiff is the owner of a piece of irrigated land of about 70 acres, generally rectangular in shape, and contiguous lengthwise to and above the main canal of defendant.

Defendant is the owner of an irrigation canal and works, its main canal running generally east and west in Dawson county.

Plaintiff's petition here states two causes of action.

The first cause is based upon the destruction of .7 acres of beets as the result of two floodings occurring in May of 1940. These were caused by the overflow of defendant's canal. The trial court found that plaintiff was damaged in the sum of $10.31.

The second cause of action is based upon damage to and destruction of beets and the killing of a perennial crop of alfalfa on another part of the same farm by flooding which occurred beginning on June 7, 1940. The trial court found for plaintiff and awarded damages in the sum of $101.65 for the beets and $500 for the alfalfa.

Plaintiff's land is bisected by a draw or creek running generally north and south through about the center of his land. This in the lower area is referred to as Spring creek. This creek forms the outlet of a drainage basin several miles to the north and extending generally north and south, and empties into the Platte river. The creek is described as a swale or dry creek, except in times of heavy rainfall. Its meanderings are defined but without distinct banks until it reaches within a short distance of plaintiff's land. There it has distinct banks. At a point about 100 feet north of defendant's canal the west bank is lower than above that point.

In 1925 defendant constructed a concrete box underdrain two feet by six feet, and a 24-inch diameter pipe underdrain at the point where the bed of the creek intersects its canal. At a higher elevation they had provided two structures, six feet wide, in the upper bank of their canal, capable of being opened to allow excess flood waters to enter their canal.

To the east of Spring creek, there originally appears to have been a swale called Stump ditch or creek, which in part at least drained naturally to the east of Spring creek. About 1891 or 1892 an irrigation ditch was built along the east side of this swale, so that waters no longer passed down it, but were diverted onto the lands to the west and excess waters reached Spring creek. Thereafter, the lands below that ditch were tilled and leveled, and the ditch no longer existed in fact. About 1935 Stump creek was tapped with a drain ditch about two miles north of plaintiff's land and carried into Spring creek a half a mile or so north of plaintiff's land. This prevented flood damage to the intermediate lands.

The Cozad Irrigation Ditch runs generally east and west across this drainage area a few miles to the north of defendant's canal. Still a few miles further to the north the Gothenburg Irrigation Ditch runs generally east and west across this drainage area.

During the night of June 6, 1940, over two inches of rain fell at Cozad and apparently a heavier fall occurred in the drainage area to the north.

At that time the defendant's canal was carrying a considerable quantity of water diverted from the river. The next morning its wasteway to the east of the point in question was opened, and during the early forenoon its intake gates were closed. At that time the water had backed up and flooded plaintiff's land west of the creek, although the underdrains were functioning. The canal being filled with water, the spillway gates into it were not then opened. At about noon the water was coming down from the north, and, so far as plaintiff's land is concerned, within the banks of the creek until it reached a point about 100 feet from de-

fendant's canal. There it overflowed the bank and had flooded plaintiff's land to a depth up to three feet, or more. The underdrains were clogged with weeds and other debris'. The defendant's canal was then empty. The gates of the spillway were opened as much as possible, permitting the accumulated water to enter the canal. The obstructions in the underdrains were removed, and after some time the height of the water receded. Plaintiff's land remained under water for two or three days. The evidence is that the rainfall on plaintiff's land would not have caused the flooding and would have drained off without damage to his crops. The evidence also is that had defendant's structure not been placed across this creek, the flood waters would have passed on without damage to plaintiff.

Also, during the day of June 7, the drain ditch was emptying water into Spring creek above plaintiff's land. On the morning of that day, the Gothenburg canal was carrying a small head of diverted water sufficient to prime the ditch and keep down the growth of weeds. Its intake gates were closed early that morning. Floodwaters from the north came down to the Gothenburg canal and overflowed its banks, and ran into the canal. Shortly after noon of that day, the south bank of this canal gave way and the waters were released to flow south and eventually into Spring creek. At the same time, floodwaters overflowed the banks of the Cozad canal and came on down into Spring creek. All these waters, however, remained within the banks of Spring creek until they reached a point about 100 feet from defendant's canal, where they banked up against the canal and flowed out upon defendant's land.

The above statement of facts is consistent with the evidence and the findings of the trial court.

Plaintiff alleges that defendant was negligent in the construction of its outlet or underdrain in that it was inadequate to permit floodwaters to pass through in sufficient quantity and to prevent the accumulation of waters that flooded plaintiff's land; and that it was negligent in permitting the underdrains to become clogged. The trial court

found generally and specifically for the plaintiff on these allegations of negligence.

Defendant argues that for 20 years prior to the time in question these structures had proved adequate, and that negligent construction and operation were not proved.

We have repeatedly held that it is the duty of those who build structures across natural drainways to provide for the natural passage through such obstruction of all waters which may be reasonably anticipated to drain there. This is a continuing duty. *Crummel v. Nemaha County,* 118 Neb. 355, 224 N. W. 864; *Leaders v. Sarpy County,* 134 Neb. 817, 279 N..W. 809; *Webb v. Platte Valley Public Power and Irrigation District ante* p. 61, 18 N. W. 2d 563.

It appears quite obvious that the underdrains were not adequate to permit the passage of all waters which the defendant should have anticipated might drain there. In fact, this evidence shows that defendant did anticipate that the underdrains would not be sufficient, for it provided an outlet into its canal for excess waters not passing through the drains. This outlet was closed when the crest of the flood reached plaintiff's land. We think the evidence is ample to sustain the finding of the trial court of inadequate and negligent construction and operation.

Defendant next contends that there was other water commingled with the impounded floodwaters, which contributed to the damage plaintiff suffered, and that it was incumbent upon the plaintiff to allocate the damages arising from each of said sources, and no competent proof of such allocation being shown, the judgment cannot be sustained. Defendant cites *Lincoln Joint Stock Land Bank v. Platte Valley Public Power and Irrigation District,* 140 Neb. 316, 299 N. W. 485; *Snyder v. Platte Valley Public Power and Irrigation District,* 140 Neb. 897, 2 N. W. 2d 327; *Robinson v. Dawson County Irrigation Co.,* 142 Neb. 811, 8 N. W. 2d 179; *Seibold v. Whipple,* 143 Neb. 167, 9 N. W. 2d 154; *Murphy v. Chicago, B. & Q. R. Co.,* 101 Neb. 73, 161 N. W. 1048; *Compton v. Elkhorn Valley Drainage District,* 124 Neb. 299, 246 N. W. 340; *Harris v. Lincoln & N. W. R. Co.,*

91 Neb. 755, 137 N. W. 865; *Republican Valley R. Co. v. Fink*, 18 Neb. 89, 24 N. W. 691; *McAdams v. Chicago, R. I. & P. Ry. Co.*, 200 Ia. 732, 205 N. W. 310.

The rule as to allocation of damages is applicable where damage is caused by the several and independent negligent acts of two or more parties, so that it may be found that the act of each resulted in some injury and the consequences of their acts are separable. Each tort-feasor is then held liable only for so much of the injury as was caused by his act. 1 Cooley, Torts (4th ed.), sec. 86, p. 279; Gould, Waters (3d ed.), sec. 222, p. 439; 4 Sutherland, Damages (4th ed.), sec. 1059, p. 3938; 3 Kinney, Irrigation and Water Rights (2d ed.), sec. 1685, p. 3105; Annotations, 9 A. L. R. 942, 35 A. L. R. 412, 91 A. L. R. 763; 62 C. J., sec. 45, p. 1131; *Chipman v. Palmer*, 77 N. Y. 51; *Miller v. Highland Ditch Co.*, 87 Cal. 430, 25 Pac. 550; *Sellick v. Hall*, 47 Conn. 260; *Blaisdell v. Stephens*, 14 Nev. 17. The rule requires that plaintiff establish that a negligent act of the defendant was the proximate cause of the damage which he suffered. Where a substantial amount of water from another source or sources has been added to the water for which defendant is liable, and the combined waters have caused the damage, then it is incumbent upon the plaintiff to establish either that his damages would have occurred from the waters for which defendant is liable, or to establish the amount of his damage that had been caused by the waters for which defendant is liable. To apply the rule otherwise would make it an instrument by which damage liability would be avoided. So to apply it is to require the tort-feasor to pay that for which he is liable.

Defendant contends that there are three sources of such other waters shown by the evidence.

First, there is evidence of waters that came upon plaintiff's lands, and into the accumulated water on the damaged area, from the land immediately to the west. This evidence is controverted. The amount of this water is not shown. It appears to have been in the drainage area of Spring creek, and although it did not come down the creek

from the north, it reached the point where it, along with other waters, was impounded by defendant's canal. It clearly comes within the waters which defendant should have anticipated would drain down and off through Spring creek.

Next, there is evidence that there was some diverted water flowing in the Gothenburg canal on the morning of June 7. The intake had been closed some hours before the break in that canal. There is no evidence showing the amount of that water, nor the amount, if any, which entered the floodwaters which were impounded by defendant's canal. For aught that appears from this record, that water could have passed the point of the break long before it occurred. The evidence would not sustain a finding that any material amount of the damage-causing water came from that source. There also is evidence that the Cozad canal was running to "capacity" without a showing as to what the capacity was or the source of the water, whether diverted or flood. The evidence also is positive that there was no washout in the banks of the Cozad canal. The floodwaters came down, ran over the upper bank, filled the canal, and ran over the lower bank. This evidence would not sustain a finding that there was any material amount of foreign water reaching the floodwaters. In fact, it would indicate that the Cozad ditch and the Gothenburg ditch also carried away a part of the floodwaters. There is evidence that both the Gothenburg and Cozad canals retarded the normal flow of floodwaters down the natural drainage course and prevented those waters reaching the impounded waters and increasing the flood level at its crest.

The third source of waters was from the Stump ditch or drainage area. The evidence is clear that for almost fifty years prior to 1940, floodwaters from that source had spread out across the lands and drained into Spring creek on or above plaintiff's land. For that period of time, the land and Spring creek carried that drainage burden. That water also falls within the waters which defendant should have anticipated would drain down Spring creek.

We see nothing in this evidence which required the plaintiff to allocate damages, or which required the court to deny the award for damages sustained because of such waters.

As to the damages resulting from the May, 1940, flooding involved in plaintiff's first cause of action, he proved that he received as rent a share of the beet crop, the area drowned out, the production on the balance of the tract, and the price of beets, and on that basis arrived at his damages. There is a dispute in the evidence as to whether or not the beets had at that time been actually planted. That dispute the trial court resolved in favor of the plaintiff. There is no dispute that because of the flooded condition beets or other crops could not thereafter be planted on the land so flooded.

As to the damages caused by the flooding on June 7, plaintiff proved that as landlord he received as rent a share of the beet crop; he proved the area drowned out upon which no beets or other crops were raised that year, the area damaged by the floodwaters, the production on land under conditions similar to his own in the same area, the production that he actually had on the flooded lands, and the price received for the beets produced. By that process, he arrived at the damages which he sustained. As to the damage to his alfalfa land caused by the June 7 flooding, plaintiff proved that alfalfa was a perennial crop; that 20 acres of it were killed by the waters standing on it for a period of days; that the fair market value of the land immediately before the flooding was $100 per acre and immediately thereafter was $75 per acre.

There was no other evidence of the amount of damages. That the crops were destroyed and damaged as a result of the flooding is shown. The trial court found in accord with this testimony.

The defendant contends that this evidence was not competent nor sufficient to prove damages. This same contention was advanced in *Gledhill v. State,* 123 Neb. 726, 243 N. W. 909. We there reviewed the authorities. We find the language there used is applicable here. "The trial court assessed the damages for the loss of the use of the land for

that year. Much of this land involved was rented to tenants who gave the owner a share of the crop as rental. The trial court determined the value of the use of the land from evidence tending to prove the value of the crop which would have been raised on the land but for the damage caused by the flood. ' * * * The question of whether damages based on the result of an unmatured crop are speculative must be determined by whether there is sufficient data to determine with reasonable certainty the probable value it would have had if matured.' * * * The determination of the value of the loss of the use of this land can be made almost certain in this case if based upon the evidence of the value of the crop which could have been raised upon this land but for the flood. * * * No better way could be devised to determine the rental value of this land than to determine the value of the crop they could and would have produced except for the flooding. The evidence in this case shows that the cultivation of similar crops on portions of the same or adjoining lands under similar conditions furnishes sufficient data to remove the uncertainty as to damage of the unmatured crops. When there is evidence of the actual value of other matured crops of a like kind grown during the same period, in portions of the same or adjoining land under similar conditions, there is sufficient data to determine with reasonable certainty the probable value of an unmatured crop if it had matured. * * *

"In this case, there was nothing left to conjecture or speculation as to the probability of the crop or the extent of it dependent upon the rainfall or unfavorable conditions. Every element surrounding the production of a crop was then known and was applicable alike to the land that was flooded and that which was not."

The rule as to the damages to the alfalfa land long followed by this court is: "In case of the destruction of a permanent or perennial crop, such as alfalfa, the measure of damages is the difference between the value of the land before and after the destruction of the crop." *McKee v. Chicago, B. & Q. R. Co.*, 93 Neb. 294, 140 N. W. 145.

Finally, defendant contends that this rainfall was unprecedented and amounted in law to an act of God relieving defendant from liability, citing *Matousek v. Galligan*, 104 Neb. 731, 178 N. W. 510. We recently reviewed a similar contention in *Webb v. Platte Valley Public Power and Irrigation District, supra*. We find no merit in this contention.

The judgment of the district court is affirmed.

AFFIRMED.