VICTOR H. HALLIGAN, TRUSTEE OF THE ESTATE OF JOHN J. HALLIGAN, DECEASED, ET AL., APPELLEES, V. ALF ELANDER ET AL., APPELLEES, IMPLEADED WITH THE CENTRAL NEBRASKA PUBLIC POWER AND IRRIGATION DISTRICT, INC., APPELLANT.

VICTOR H. HALLIGAN, TRUSTEE OF THE ESTATE OF JOHN J. HALLIGAN, DECEASED, ET AL., APPELLEES, V. ALF ELANDER ET AL., APPELLEES, IMPLEADED WITH PLATTE VALLEY PUBLIC POWER AND IRRIGATION DISTRICT, A PUBLIC CORPORATION, INTERVENING DEFENDANT, APPELLANT.

25 N. W. 2d 13

FILED NOVEMBER 22, 1946. Nos. 31961 and 31965.

No. 31961: *Beatty & Clarke, P. E. Boslaugh,* and *R. O. Canaday,* for appellant.

*Beeler, Crosby & Baskins, Beghtol & Rankin, E. H. Evans,* and *Victor H. Halligan* for appellees.

No. 31965: *Beeler, Crosby & Baskins,* for appellant.

*Beatty & Clarke, Beghtol & Rankin, R. O. Canaday, E. H. Evans, P. E. Boslaugh,* and *Victor H. Halligan,* for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

CHAPPELL, J.

A former opinion in this case is reported *ante* p. 156, 22 N. W. 2d 647. Therein we dismissed plaintiff's petition and supplemental petition, intervener's petition, and the

landowner defendants' cross-petitions, reversing the judgment of the trial court, which found generally for plaintiffs. However, reargument was allowed and upon reconsideration, we conclude that our former opinion should be and hereby is vacated and set aside. In so doing, we arrive at substantially the same result, but base our conclusions upon other grounds, which we believe to be more tenable as well as decisive of all other important issues presented by the record.

Plaintiff's action was in equity to obtain injunctive relief designed to abate seepage upon their agricultural lands, alleged to have been caused by the projects of defendants. The Central Nebraska Public Power and Irrigation District will be hereinafter called "Central," and intervener, Platte Valley Public Power and Irrigation District, hereinafter called "Platte Valley." Both such districts were organized under chapter 70, article 6, R. S. 1943. All of the lands involved are in Lincoln County, Nebraska. Since the trial court found in its decree that Victor H. Halligan was the owner of the Southeast Quarter (SE¼) and North Half (N½) of Section Eighteen (18) and all land lying south of the Platte River in Section Seven (7), Township Thirteen (13), Range Twenty-nine (29) West of the 6th P. M., and Section Fifteen (15), Township Thirteen (13), Range Thirty (30) West of the 6th P. M. at time of trial, he will be hereinafter called plaintiff.

All parties owning lands adjacent to or between plaintiff's two tracts of land and over which Fremont Slough, a natural watercourse, flows to the east into Little River, were made defendants. The land of defendant Reynolds, who defaulted, and is not involved in this appeal, is in Section Seventeen (17), adjacent to Section Eighteen (18) on the east. Defendant Whites' land is the Southwest Quarter (SW¼) of Section Eighteen (18). Fremont Slough flows only across the extreme northwest corner of their land, then follows the section line, but on plaintiff's land, having been straightened by agreement with the Whites. Defendant Elanders' land is the East Half of the

East Half (E½E½) of Section Thirteen (13), adjacent to Section Eighteen (18) on the west, and lots Nine (9) and Ten (10) of Section Twelve (12). Defendant Rices' land is the West Half of the East Half (W½E½) of Section Thirteen (13), adjacent to Elanders on the west, and lot Eleven (11) of Section Twelve (12). Defendant Talbots' land is the West Half (W½) of Section Thirteen (13), and the West Half (W½) of Section Twelve (12), lying south of the South Platte River, adjacent to Rices on the west. The land of defendants Pizer and Bergman, who defaulted and are not involved in this appeal, is Section Fourteen (14), adjacent to plaintiff's Section Fifteen (15) on the east, the South Half (S½) of Section Eleven (11) lying south of the South Platte River, and the East Half (E½) of Section Ten (10) lying south of the South Platte River. All of the land involved is almost level and slopes generally slightly to the east.

Bearing in mind the ownership and relative location of the lands involved, a brief undisputed history of the construction of the projects becomes important. In 1940, Central completed a diversion works across the Platte River just below the confluence of the North and South Platte Rivers near the east line of Section Seven (7), which diverted waters from the Platte River into a supply canal constructed from the south end of the diversion along the east side of Sections Seven (7) and Eighteen (18). To confine flood waters of the South Platte River coming down from the west to the channel of the river, Central constructed a large dike with a borrow pit on the west side from the head gate southwest across Sections Seven (7) and Twelve (12), to a point a short distance east of the center of Section Thirteen (13).

Central's borrow pit crosses Fremont Slough on Rices' land. There a culvert was placed in Fremont Slough under the dike to permit its waters coming down from the west to flow on down the slough. North of the slough, on Rices' land, Central constructed a road crossing over the borrow pit for Rices' use, under which are two culverts slightly

higher than the one in Fremont Slough, to force water down the slough before it overflows into the pit. A similar road crossing with three culverts was constructed for Elanders' use farther north, where the dike and borrow pit cross the Little River.

Central's operations began in January 1941. In the spring, plaintiff contended that his land was seeped. At his request, Central constructed certain drainage ditches wholly on plaintiff's land, designed to alleviate seepage. One such followed Little River, a natural watercourse. That ditch crossed Sections Seven (7) and Eighteen (18) from the northwest in a southeasterly direction, and at the west end turned south along the west edge of Sections Seven (7) and Eighteen (18) for some distance. Another such ditch followed Fremont Slough, straightening and deepening the bed thereof and then turned north along the west edge of Section Eighteen (18) for some distance. Fremont Slough was not altered in any respect on the lands of Elander, Rice or Talbot.

Platte Valley completed its primary construction in 1936 and in 1938 began the diversion of waters from the North Platte River through its canal and diversion system into its regulating reservoir and therefrom through its intake canal and forebay, waters were discharged through its house to develop electric power and be returned through its tailrace to the South Platte River channels for delivery to irrigation ditches east of North Platte. From its operations, waters were lost by seepage into lands along the South Platte River, which it attempted to drain by utilizing natural watercourses along the South Platte, including Fremont Slough. Complaint was made that seepage developed on Sections Fourteen (14) and Fifteen (15). In 1943, at the request of plaintiff and the owners of Section Fourteen (14), Platte Valley straightened and deepened Fremont Slough westward from the east line of Section Fourteen (14) to the west line of Section Fifteen (15), with stub drainage ditches designed to relieve seepage and extending from the south into Fremont Slough

near the center of both sections.

We come then to the issues presented by the record. The pleadings, insofar as important, all ask for general equitable relief and are substantially as follows: Plaintiff, in his original petition, described Central's original construction, which it is alleged raised the water table on Sections Seven (7) and Eighteen (18) from five to eight feet, creating. seepage, and that at plaintiff's request, Central constructed the ditches heretofore described, designed to alleviate the condition. He alleged that such construction operated satisfactorily until a greater amount of water than its normal flow started to come down Fremont Slough from Platte Valley construction to the west, passed through the culverts on the Rice land and overburdened the ditches constructed by Central on Sections Seven (7) and Eighteen (18). It is alleged that he demanded of Central that it regulate the flow through the culvert under the dike by placing a check in it, which it did, and that Central remove the road-crossing culverts, to which defendants White, Elander and Rice objected, demanding that the water table under their lands be maintained higher than existed before construction of the projects, and threatened litigation if it were not so maintained. Plaintiff prayed generally that defendants be enjoined from maintaining any structures or operating Central's works in any manner that would obstruct Fremont Slough or raise the water table to a higher level than existed prior to the construction of Central's projects, and thereby alleviate his seepage.

Central's answer denied generally, but admitted the construction of drainage ditches on plaintiff's land designed to prevent seepage which were adequate and sufficient for the purpose, but alleged that plaintiff and the other defendants disagreed on the plan of operation, one demanding that its works be operated to lower the water table, and the other to keep the water table higher. It was then alleged that both threatened Central with litigation unless operated to meet their respective desires. Central specifically denied that its construction had caused any damage to

plaintiff by seepage or otherwise, but alleged that since its construction any seepage appearing on plaintiff's land was caused by the operation of Platte Valley, for which Central was not responsible. Central alleged that it was ready and willing to so operate its ditches as to maintain the water table and drainage condition as it existed prior to original construction, either as agreed upon by plaintiff and defendants, or as may be found and determined by the court. Its prayer was that the court enter a decree determining the rights of the plaintiff and other defendants as between themselves and the manner in which defendant should operate its works.

Platte Valley then filed a petition in intervention. Therein is set forth its construction heretofore recited, and alleged that under the provisions of the statute it was liable in damages for seepage or overflow when and if it occurred but that any seepage condition on Sections Fourteen (14) and Fifteen (15) had been relieved by it. Intervener alleged that it had not increased the flow in Fremont Slough because its surplus waters were diverted by its tailrace, but that Fremont Slough did not operate reasonably because it had become obstructed by natural growth or debris, and by reason of the interference of plaintiff and Central, which held back a portion of the waters, thereby raising the water table as complained by plaintiff. It alleged that intervener was entitled to a court order requiring plaintiff and defendants to refrain from the maintenance of any obstructions in Fremont Slough from the east line of Section Fourteen (14) to the east, or that if they failed therein, intervener should be granted the right to remove any obstructions and open and clean Fremont Slough to the east on and across the plaintiff and the defendant landowners. It prayed for an order requiring plaintiff and defendants, in the operation of the drainage works as constructed on and along the lower crossing of Fremont Slough from in any manner interfering with or permitting obstruction of the free flow thereof, thereby preventing further seepage

and permitting intervener, in the operation of its works, to utilize the slough as a natural watercourse or drainway for seepage and floodwaters.

Plaintiff then filed an amended and supplemental petition, incorporating therein all the allegations of his original petition. Reynolds, and the Pizers, Bergmans, and Talbots were made additional defendants. The construction of Platte Valley on Sections Fourteen (14) and Fifteen (15) was set forth at length, by reason of which it was alleged the flow of water in Fremont Slough toward the east had been increased, and not being able to carry the excess flow, it should be ordered extended and deepened as a ditch across defendant landowners to Central's outlet in the South Platte River. It prayed that the rights of all parties be adjudicated, and that Central and Platte Valley be required to construct such canals and works as would be adequate to carry out the order of the court with regard to the maintenance of the water level along Fremont Slough and the lands tributary thereto as it was prior to the construction of the projects.

Defendants Talbot answered plaintiff's petition and supplemental petition by denying that seepage ever existed on their lands or that an excess of water now flows in Fremont Slough except by reasons of floods or heavy rain. They denied generally, and alleged that the construction and operation of the projects had lowered the water table below normal, thereby damaging them, by depriving their land of sub-irrigation. They alleged that to permit the straightening and dredging of Fremont Slough and otherwise facilitating its flow as prayed, would cause them irreparable damage, thereby taking and damaging their land without due process of law and payment of compensation. They prayed that plaintiff's action be dismissed as without equity, and that plaintiff be enjoined from disturbing them in the enjoyment of their rights to the waters of Fremont Slough as now existing.

Defendants Rice filed a similar answer to plaintiff's petition and supplemental petition, with a further prayer that

plaintiff be enjoined from causing the flow of Fremont Slough to be diminished or lowered to less than three cubic feet per second.

Defendants Elander filed an answer and cross-petition to plaintiff's petition and supplemental petition, which also contained similar allegations, except it was alleged that at the request of plaintiff, two drainage ditches were constructed by Central on plaintiff's land along the east side thereof, one from a point of higher contour north to Little River and the other from that point south to Fremont Slough, thereby permanently damaging defendants' land by reducing the water table below normal and damaging their 1943 and 1944 wild hay crops without due process of law, or payment of compensation. They asked the court to find plaintiff's action to be without equity, that a minimum flow of three cubic feet per second be ordered to flow down Fremont Slough, and that plaintiff and the district be enjoined from interfering therewith, and that they be required to abate the damage done by the two drainage ditches and restore defendants' land to its normal condition, or that defendants recover for permanent damages to their land and that they be awarded damages to their crops.

Defendants White filed a similar answer and cross-petition, alleging that at plaintiff's request the district went on plaintiff's land immediately north of defendants' land, and straightened, deepened, and diverted Fremont Slough, thereby lowering the water table. It was alleged that it also constructed a dike on plaintiff's land, without a proper drain, thereby accumulating excess waters, all of which it is alleged permanently damaged their land and damaged their 1943 and 1944 crops, without due process of law or payment of compensation. Their prayer was that the court find plaintiff's action to be without equity, that a minimum flow of three cubic feet per second be ordered permitted to flow down Fremont Slough, and that plaintiff and the district be enjoined from interfering therewith and be enjoined from maintaining the present straightened and

deepened Fremont Slough, or that they recover for perma-
nent damages to their land, and that they be awarded dam-
ages to their crops.

Defendants Elander, White, Rice, and Talbot filed a joint
answer and cross-petition to intervener's petition. They
admitted the construction of intervener, otherwise denied
generally, and denied that intervener's construction on
Sections Fourteen (14) and Fifteen (15) created any ex-
cessive flow in Fremont Slough or that its free flow was ob-
structed in any manner. They alleged that straighten-
ing and deepening its course in the manner contemplated
by plaintiff and intervener would do irreparable damage to
their lands by lowering the water table and depriving them
of sub-irrigation, thereby taking and damaging their prop-
erty without due process of law or compensation. They
prayed that the petition of intervener be denied, wherein
it seeks to interfere with the normal flow of Fremont
Slough passing over their lands, and that it be enjoined
from entering upon their lands for such purpose. They
also asked the court to establish five cubic feet per second
as the minimum flow of Fremont Slough arising from the
west, which should be permitted to pass under its tailrace
except in times of flood.

Appropriate replies to answers, and answers to cross-
petitions, were filed, and the case proceeded to trial. There-
upon, the trial court entered its decree. Therein, after de-
tailing the respective ownership of the lands and the con-
struction of Central and Platte Valley, it was found that
Fremont Slough was a natural meandering stream between
the South Platte and Platte Rivers and the hills to the
south which did not, except for floods or rainfall, flow to
exceed two second-feet of water, and which prior to con-
struction of the projects, was dry for a part of every sum-
mer. It found also that at the time seepage occurred, the
level of the underground water on all lands involved had
an average water table of six feet above that normally
existing before construction, and that defendant landowners
were not entitled to a higher water table than existed prior

to construction.

The decree found that seepage appeared on Sections Seven (7) and Eighteen (18), which was caused by the combined action of Central and Platte Valley, and that seepage appeared on Sections Fourteen (14) and Fifteen (15), which was very likely caused by Platte Valley. It was found that with the consent of plaintiff, Central and Platte Valley constructed drainage ditches which were inadequate and insufficient to drain plaintiff's lands, but might be made so at an expense small compared with the damage done by allowing such seepage to continue. It found that the amount of water allowed to flow down Fremont Slough and through the project canals had a material effect on the underground water level and affected the operation and functioning of the drainage ditches constructed, which, if obstructed, caused formation of lakes or ponds, and increased the water level under lands lying downstream.

The decree specifically recited that it did not attempt to direct in any way the manner or method that Central and Platte Valley should use in draining seepage from plaintiff's lands, but decreed that a duty was imposed upon them to do so, even by the use of eminent domain if necessary where it might be effected with a smaller expenditure of funds than would be necessary to pay damages caused by seepage, and the decree, by mandatory injunction, ordered them to do so. The court decreed that it would be a reasonable expenditure of effort to comply with the injunction if Central and Platte Valley would deepen and properly recondition all drainage ditches on Sections Seven (7) and Eighteen (18) down to gravel; extend certain other ditches to designated points; connect the two ditches along the west edge of plaintiff's land, and then deepen it to gravel upon such level as to cause the waters therein to drain to the north into the Little River ditch from the highest point between Fremont Slough and Little River; take such other steps as are necessary, by eminent domain if necessary, to construct a ditch eastward from the siphon under Central's canal in Fremont Slough to allow

a ready flow of water accumulating on the west side thereof; and generally prevent more flow of water down Fremont Slough than before construction of the projects, having in mind a proper consideration for the riparian rights of defendants over which it flows.

The court also decreed that it would be a reasonable expenditure to comply with the injunction if Platte Valley would deepen all drainage ditches on Section Fifteen (15) to gravel with proper grade, and to permit a free flow of drainage away from Section Fifteen (15) ; and also prevent more flow of water into Fremont Slough accumulating west of Section Fifteen (15) at their tailrace, than would make a greater flow across the lands involved than existed prior to construction of the projects.

Motions for new trial were overruled. Central and Platte Valley appealed to this court, and defeandants Elander, White, and Talbot cross-appealed. The briefs are voluminous and the assignments of error too numerous to set forth at length herein. Suffice it to say, that in the light of the record before us, the following propositions are presented for decision, to wit: (1) Whether the court's decree responded to the issues raised by the pleadings; (2) whether the trial court erred in its refusal to award defendant landowners affirmative equitable relief; (3) whether the trial court erred in excluding the evidence of Elander and White relating to the amount of damages to their lands by reason of the construction on plaintiff's land by Central at plaintiff's request; (4) whether plaintiff had a right in any event to a mandatory injunction compelling Central and Platte Valley to drain his lands by reason of a duty allegedly imposed by section 46-156, R. S. 1943, or by contractual estoppel; and (5) whether plaintiff had an adequate remedy at law by virtue of section 70-671, R. S. 1943.

With reference to the first question, it will be noted that all parties prayed for general equitable relief. It has long been the rule, only recently reaffirmed, that a prayer for general relief in an equity action is as broad as the pleadings and the equitable powers of the court. See Olson v.

Lamb, 61 Neb. 484, 85 N. W. 397; Gibson v. Koutsky-Brennan-Vana Company, 143 Neb. 326, 9 N. W. 2d 298.
: An examination of the decree will disclose that the trial court in the final analysis simply established the height of the water table, held that plaintiff's lands were seeped by Central and Platte Valley, and that they owed a legal duty to drain them which they were required to perform. The decree specifically did not "attempt to direct, in any way, the manner or method that shall be used by either the defendant corporation or the intervener in effecting the said drainage," except that in doing so they should be required to use eminent domain if necessary. True, the trial court did adopt an independent theory of its own with regard to how Central and Platte Valley could, if they desired, obey the injunction to drain plaintiff's lands, but by the very terms of the decree itself, that theory was not binding on anyone as a mandatory order. We conclude, therefore, that the findings and judgment of the trial court were clearly within the issues presented by the pleadings if equity should have afforded such relief. However, for reasons hereinafter discussed, we find that it should not.

We turn then to the question of whether the trial court erred in its refusal to award defendant landowners affirmative equitable relief. In that regard, their cross-petitions prayed for such relief, but, as disclosed by the record, they were defensive merely. The primary basis of all defendant landowners' claims for affirmative equitable relief was that the water table had been lowered by the construction and operation of the projects below that reasonably and normally existent before construction. The evidence does not sustain that contention.

It is generally recognized that the dismissal of an original petition in equity does not necessarily carry with it a cross-petition. However, the distinction is made that if the cross-petition is defensive merely, a dismissal of the original dismisses the cross-petition. 21 C. J., Equity, § 616½, p. 514. Since we find that plaintiff's petition and amended supplemental petition and the petition in intervention

should be dismissed and that defendant landowners' cross-petitions, praying for equitable relief, were defensive merely, then their cross-petitions would be governed by the above rule requiring dismissal thereof. In other words, as the record comes to this court, a refusal to grant plaintiff and intervener equitable relief in effect protects the defendant landowners' alleged equitable rights in the only manner available to them.

Under the circumstances appearing in the record, did the trial court err in excluding the evidence of Elander and White relating to the amount of damages to their land and crops by reason of the construction by Central, at plaintiff's request, on his own land, which was designed to relieve seepage thereon? With reference to defendants White, we are unable to find in the record that they ever testified or offered to testify concerning the amount of damages alleged to have been suffered by them either to their lands or their crops. Further, the record affirmatively discloses that they agreed to the straightening of Fremont Slough on plaintiff's land.

There is evidence in the record by defendant Alf Elander relating to the amount of damages alleged to have been suffered by him, which, upon motion, was stricken by the trial court. It will be remembered that by their cross-petition, Elanders claimed damages because Central, at plaintiff's request, constructed two ditches east of their land but on plaintiff's land, which allegedly lowered the water table. Concededly, however, one such ditch was constructed wholly on plaintiff's land for the purpose of draining excess waters in the general course of natural drainage into Fremont Slough, a natural watercourse also on plaintiff's land. Concededly, the other was constructed wholly on plaintiff's land for the same purpose and in the same manner into Little River, also on plaintiff's land, which is a natural watercourse emptying into the Platte River.

Section 31-201, R. S. 1943, provides: "Owners of land may drain the same in the general course of natural drainage by constructing an open ditch or tile drain, discharging

the water therefrom into any natural watercourse or into any natural depression or draw, whereby such water may be carried into some natural watercourse; and when such drain or ditch is wholly on the owner's land, he shall not be liable in damages therefor to any person or corporation."

Without doubt under the above statute, if the drainage ditches involved were constructed in a reasonable and proper manner, conveyed a reasonable quantity of water into the watercourses, and were not negligently operated or maintained, then plaintiff's lands could be so lawfully drained and the construction thereon efficiently maintained, either by plaintiff or by someone else for him, if he engaged them to do so, without any liability for damages. See Miksch v. Tassler, 108 Neb. 208, 187 N. W. 796; Bures v. Stephens, 122 Neb. 751, 241 N. W. 542. The latter precedent recites many cases wherein the above statute has engaged the attention of this court.

In the light of the above propositions, we have examined the record and conclude that if defendant Elanders' evidence as to the amount of damages alleged to have been sustained were erroneously excluded but considered on a trial de novo here, the result would be the same. Under the circumstances, such evidence not only fails to show the necessary elements entitling them to recover their alleged damages, but was also entirely speculative and conjectural as to both cause and effect, and if erroneously excluded, it was simply error without prejudice.

As a matter of course, it should be stated that neither Central nor Platte Valley have any right to go upon the lands of defendant landowners to straighten or deepen Fremont Slough or place other construction thereon except in conformity with appropriate eminent domain proceedings, with payment of just compensation or by consent of the proprietors affected. On the other hand, the defendant landowners have no right to obstruct Fremont Slough and thereby damage plaintiff, but we find no evidence in the record which would justify a finding that they did so.

As we understand it, plaintiff contends that Platte Valley,

by its construction to the west, has materially increased the volume of natural flow to the east by casting an unreasonable quantity of excess waters into Fremont Slough, and that the court should, by mandatory injunction, order it to be decreased but further accelerated. He then argues that Central has wrongfully obstructed, and will, unless enjoined, continue to so obstruct the enhanced flow of Fremont Slough over Sections Seven (7) and Eighteen (18), thereby raising the water table and causing seepage thereon.

We doubt whether the record before us could sustain a finding that Platte Valley so materially increased the flow as alleged, but whether or no, we call attention to the fact that if it did, the increase resulted from plaintiff's request in order to relieve alleged seepage on his land, Section Fifteen (15) to the west, and plaintiff is not in a position to demand equitable relief therefrom.

In that situation the rule applicable to Central is that it is the duty of those who build structures across natural drainways or watercourses like Fremont Slough, to provide for the natural passage through such obstructions of all waters which may be reasonably anticipated to drain there, and that such duty is a continuing one. See Webb v. Platte Valley Public Power & Irrigation District, 146 Neb. 61, 18 N. W. 2d 563; Faught v. Dawson County Irrigation Co., 146 Neb. 274, 19 N. W. 2d 358.

The question then is whether Central violated that duty in such manner that equity should enjoin the alleged obstruction by injunction. True, it could be said that acceleration of the flow by Central over and beyond Sections Seven (7) and Eighteen (18) to the east might tend to relieve the alleged seepage thereon, but the evidence will not sustain a finding that Central was obstructing the natural flow of waters which could be reasonably anticipated to drain through the watercourse, and thereby caused seepage. In other words, Fremont Slough might, if accelerated beyond its natural flow as prayed, tend to relieve, but its natural flow could not be the cause of, plaintiff's alleged seepage,

and in that situation plaintiff is not entitled to equitable relief. Otherwise, whether the construction and operation of Platte Valley and Central caused seepage on plaintiff's lands we cannot and do not determine in this action.

We come then to the question whether plaintiff had a right in any event to injunctive relief. We have searched the record and find that plaintiff neither pleaded nor proved any official contractual obligation or duty on the part of Central and Platte Valley or either of them to drain the alleged seepage from his lands which could sustain the contention made in plaintiff's original brief that they were estopped for that reason to deny the duty.

In that connection, then, the only question remaining is whether section 46-156, R. S. 1943, imposes the duty upon them, by reason of section 70-667, R. S. 1943, which provides that all provisions of law now applicable to irrigation districts, as regards certain functions, should be applicable "as nearly as may be" to districts organized under sections 70-601 to 70-679, R. S. 1943.

It will be noted that section 46-156, R. S. 1943, imposes a limitation upon the power of irrigation districts organized under sections 46-101 to 46-128, R. S. 1943, to incur any debt or liability in excess of the express provisions of sections 46-101 to 46-1,111, R. S. 1943. However, the section contains the following proviso upon which plaintiff relies: "*Provided,* any irrigation district organized under the provisions of sections 46-101 to 46-128 shall have power to and it shall be its duty to provide for the proper drainage of any and all lands embraced within its limits which are or have been subirrigated by reason of the lawful use of water from its canal by the owner or lessee of the lands subirrigated or from any cause not the fault or by the consent of such owner or lessee. For such purpose such district shall have all the authority herein granted for levying special assessments or otherwise providing funds necessary to properly drain such lands, * * *."

In that connection it must be presumed that when the Legislature enacted chapter 70, article 6, R. S. 1943, inclu-

sive of section 70-667, R. S. 1943, it did so with full knowledge of the preexisting legislation applicable to irrigation districts and the judicial decisions of this court construing and applying that legislation. 59 C. J., Statues, § 600, p. 1008. That it did so is evident from a perusal of chapter 70, article 6, R. S. 1943, inclusive of section 70-671, R. S. 1943, which is exclusive and places no limitations upon either the right or the remedy against districts organized under that chapter for the recovery of damages from seepage caused by them, thereby clearly demonstrating that the Legislature did not intend that section 46-156, R. S. 1943, should be applicable to such districts in the manner claimed by plaintiff, whether the lands involved were embraced within their limits or otherwise. We call attention to the fact that this court construed and applied the proviso appearing in section 46-156, R. S. 1943, before the enactment of chapter 70, article 6, R. S. 1943, in a manner which demonstrates that the above conclusion is correct.

For example, in State ex rel. Read v. Farmers Irrigation District, 116 Neb. 373, 217 N. W. 607, it was said: "In other words, by construction, the language of the amendment would read: 'Provided, any irrigation district organized under the provision of this article shall have power to and it shall be its duty to provide for the proper drainage of any and all lands embraced within its limits which are or have been subirrigated; (a) by reason of the lawful use of water from its canal by the owner or lessee of the lands subirrigated; (b) by reason of any use of the water (from its canal) from any cause not the fault or by the consent of such owner or lessee.' This construction necessarily follows, as the legislative intent must be determined from a consideration of the act as a whole, a rule by us universally adhered to."

Likewise, in Omaha Life Insurance Company v. Gering & Ft. Laramie Irrigation District, 123 Neb. 761, 244 N. W. 296, plaintiff, an owner of land within the irrigation district, sought to recover damages both for negligence and under section 21, article 1, of the Constitution, which re-

quires payment of just compensation for property taken or damaged for public use. Plaintiff was denied that right. With reference to the statute involved, it was said in the opinion: "The right to drainage provided by this statute is in the nature of a contractual right arising by operation of law. It is not based upon negligence, and the question of the damage to property for public use without just compensation is not involved. In effect, the parties organizing the district engaged in the common enterprise of conducting water through ditch for delivery to the various landowners of the district for irrigation purposes. In addition to the delivery of water, another purpose and duty of the organization is to drain all land within the district seeped or subirrigated by reason of the lawful use of water or by leakage from any canal of the district. In other words, the landowners of the district collectively through the organization of a district have agreed to drain the land of any one in the district which may become seeped. * * * In turn, the individual landowner by participating in the organization is bound to accept the provision made for him by statute. * * * Therefore, the owner of the land, having entered into a contractual relation which provides for drainage, he is bound to the terms of that contract, and he may require the district to drain his lands upon demand. Having in mind this contractual relationship between the individual landowner and the district, this court has said that the remedy provided by section 46-132, Comp. St. 1929, for the drainage of lands within an irrigation district is exclusive. State v. Farmers Irrigation District, 116 Neb. 373; Spurrier v. Mitchell Irrigation District, 119 Neb. 401; Livanis v. Northport Irrigation District, 121 Neb. 777."

True, in Wright v. Loup River Public Power District, 133 Neb. 715, 277 N. W. 53, this court held that public power and irrigation districts, such as here involved, were by virtue of section 70-667, R. S. 1943, controlled with regard to their appropriation, crossing and use of public highways, by the statutes relating to irrigation districts, "so far as they are applicable." However, "so far as they are ap-

plicable" as stated in the opinion, or "applicable, as nearly as may be," as stated in section 70-667, R. S. 1943, is always the controlling language which cannot be overlooked to determine the force of the adopted statute in a particular situation.

It is clearly observable that the circumstances of both the organization and operation of public power and irrigation districts, as well as their uses of water, are entirely different from irrigation districts, and in cases such as the one at bar, section 43-156, R. S. 1943, cannot be held, by reason of any duty imposed therein, to require public power and irrigation districts organized under chapter 70, article 6, R. S. 1943, to drain lands seeped by them, whether embraced within their limits or otherwise. The conclusion must be that Central and Platte Valley owed plaintiff no duty to drain his lands under the circumstances presented.

Therefore, if plaintiff's lands were seeped as alleged, we are required to determine the nature of his remedy. Section 70-671, R. S. 1943, relating to the liability of districts organized under that chapter, specifically provides that such districts "shall be liable for all * * * seepage damage" and that "Damages from seepage shall be recoverable when and if it accrues."

In Spurrier v. Mitchell Irrigation District, 119 Neb. 401, 229 N. W. 273, plaintiff's action was for damages by seepage from three irrigation districts, in only one of which his lands were embraced. Therein this court held that in the absence of negligence there was no liability on the part of such irrigation districts for such damages under the provisions of section 21, article I, of the Constitution, providing for the payment of just compensation when property is taken or damaged for public use. However, in the case of Snyder v. Platte Valley Public Power and Irrigation District, 144 Neb. 308, 13 N. W. 2d 160, this court specifically overruled the Spurrier case upon that question insofar as public power and irrigation districts were concerned, the effect of which is that damages from seepage caused by them can be recovered under the constitutional provision

without regard to negligence.

We therefore have the provisions of section 70-671, R. S. 1943, and the self-executing provisions of section 21, article I, of the Constitution, both of which make districts such as Central and Platte Valley liable for damages from seepage, thereby giving plaintiff in this case a plain, complete, adequate, and speedy remedy at law.

This court has heretofore so construed and applied section 70-671, R. S. 1943. In Applegate v. Platte Valley Public Power and Irrigation District, 136 Neb. 280, 285 N. W. 585, plaintiff's lands were seeped by intervener in the case at bar. He asked for damages. In that case, the district had also constructed a drainage system which was purported to, when completed, remedy and abate the seepage if properly maintained and operated as the district contemplated it should operate. The district affirmatively defended on that ground. Whether such construction would or could actually remedy and abate the seepage was, of course, entirely speculative and conjectural, as it is in the case at bar. There was in that case, as here, no showing of any official contractual action taken by the district binding it to abate the damages from seepage. Therein, we held that section 70-671, R. S. 1943, placed no limitations either upon plaintiff's right or remedy for his recovery of such damages, and that the Legislature in such cases evidently contemplated payment for and not abatement of damages from seepage. That case, it seems to us, is conclusive of and on all fours with the one at bar, although in that case we did not decide the question of the sufficiency of the affirmative defense as a matter of law because whether the proposed drainage would be effective was submitted to the jury as a disputed question of fact which it had resolved against defendant. See, also, Asche v. Loup River Public Power District, 138 Neb. 890, 296 N. W. 439; Heiden v. Loup River Public Power District, 139 Neb. 754, 298 N. W. 736; and Luchsinger v. Loup River Public Power District, 140 Neb. 179, 299 N. W. 549, wherein damages for seepage were held to be recoverable in an action at law.

We conclude that the case at bar comes within the elementary rule that "To authorize a court of equity to interfere by injunction, the facts averred in the petition and established by proof or admission must show that if the injunction be denied the complainant will suffer an irreparable injury for which he has no adequate remedy at law." Golden v. Bartholomew, 140 Neb. 65, 299 N. W. 356.

For the reasons heretofore stated, we find that plaintiff's petition and supplemental petition, intervener's petition, and the cross-petitions of defendant landowners should be and are hereby dismissed at plaintiff's cost, except that intervener shall pay all costs of the intervention.

Therefore, the judgment of the trial court as originally entered is hereby reversed and set aside and the trial court is directed to enter a decree in accord with this opinion.

REVERSED AND DISMISSED.